**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

**FILED**

JUN 17 2011

Phil Lombardi, Clerk
U.S. DISTRICT COURT

| | | |
|---|---|---|
| **GORDON TODD SKINNER** | ) | **EVIDENTIARY HEARINGS** |
| **Inmate No. 556865,** | ) | **REQUESTED** |
| **Joseph Harp Correctional Center** | ) | |
| | ) | **11 CV - 382 CVE   TLW** |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **Warden Mike Addison** | ) | |
| **Respondent.** | ) | |
| | ) | |
| | ) | |

## PETITION FOR WRIT OF *HABEAS CORPUS*

COMES NOW, Gordon Todd Skinner, *pro se*, pursuant to 28 U.S.C. §§ 2241 and 2254 and petitions this Court for a Writ of *Habeas Corpus*. Petitioner requests Court to adopt all motions, briefs, applications, exhibits and petitions filed in Tulsa County District Court and Oklahoma Court of Criminal Appeals pursuant to Federal Civil Judicial Procedure and Rules 10(C), to save unnecessary duplication.

## PETITION

1.    (a)   Name and location of court that entered the judgment of conviction you are challenging:
   **District Court of Tulsa County, Tulsa, Oklahoma**

       (b)   Criminal docket or case number:
   **CF-2003-4213**

2.    (a)   Date of the judgment of conviction:
   **June 20, 2006**

       (b)   Date of sentencing:

i



July 6, 2006

**3.**      Length of sentence:
        **30 Years, 60 Years, Life**

**4.**      In this case, were you convicted on more than one count or of more than one crime?
        **Yes**

**5.**      Identify all crimes of which you were convicted and sentenced in this case:
        **a. Conspiracy: 21 O. S. 380-592;**
        **b. Kidnapping: 21 O.S. 741-745;**
        **c. Assault and battery with a dangerous weapon 21 O.S. 645, 652, 653, 681**

6.      a)      What was your plea?
             **Not guilty**

       b)      If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead, not guilty to?
             **N/A**

       c)      If you went to trial, what kind of trial did you have?
             **Jury**

**7.**      Did you testify at a **pretrial hearing**, trial, or a post-trial hearing?
        **Yes:** *Kastigar* Hearing

**8.**      Did you appeal from the judgment of conviction?
        **Yes**

**9**. If you did appeal, answer the following:
    a) Name of court: **O.C.C.A**
    b) Docket or case number: **F-2007-1101**
    c) Result: **Denied all claims**
    d) Date of result: **June 11, 2009**
    e) Citation to the case: **2009 OK CR 19, 210 P.3d 840 (Oklahoma Cr. 2009)**
    f) Grounds raised:
       **Proposition I:** *Kastigar* **Immunity Violation; Title 18 U.S.C. § 6002 violations, 5th Amendment Clause III violations, immunity contract violations**
       **Proposition II: Allen/Brady/ discovery violation**
       **Proposition III: I.A.D.A.Violation**
       **Proposition IV: Prosecutorial misconduct**
       **Proposition V: Denied second stage sentencing Error/ Consecutive v. Concurrent**

**Proposition VI: Improper Prior Conviction Admitted into Evidence**
**Proposition VII: Correct Instruction as to 85% rule**

g) Did you seek further review by a higher state court?
**No**

h) Did you file a petition for certiorari in the United States Supreme Court?
**Yes**

If yes, answer the following:

I)     Docket or case number:
**#09-6594**

II)    Result:
***Certiorari* denied**

III)   Date of result:
**11/30/2009**

IV)    Citation to the case

**10**. Other than the direct appeals listed above, have you previously filed any other petitions, **applications**, or motions concerning this judgment of conviction in any state court?

**Yes**

**11**. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court:
**District Court of Tulsa County**

(2) Docket or case number:
**CF-2003-4213**

(3) Date of filing:
**10/06/2010**

(4) Nature of the proceeding: **Post-Conviction Relief Application**

**(5) Grounds raised:**

I)   **Ineffective Assistance of Appellate Counsel**

II)  **Due Process Violations/Government induced Ineffective Assistance of Trial Counsel**

III) ***Kastigar* Immunity Violation: O.C.C.A construed wrong set of facts- Ineffective Assistance of Appellate counsel to correctly articulate correct set of facts**

IV)  **Due Process Brady /Allen violation (F.B.I. Reports)**

iii

V) **Due Process Brady/Allen violation- prior kidnapping complaint file never turned over.**

VI) **Sixth Amendment Violation / compulsory process- DEA agent not produced**

VII) **Due Process Violation/sex crimes of Hauck**

VIII) **Illegal Enhancement of Sentence**

IX) **Brady Violation / Prosecutorial Misconduct**

X) **Due Process / Prosecutorial Misconduct Violation**

XI) **Due Process Violation / Prosecutorial Misconduct**

XII) **Due Process / Prosecutorial and Police Misconduct**

XIII) **Legal Rights and Privileges of which Petitioner was Deprived**

XIV) **Statutory Violation**

XV) **Due Process / Prosecutorial Misconduct Violation**

XVI) **Due Process / Prosecutorial Misconduct Violation**

XVII) **Due Process Violations**

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?
> **No**

(7) Result: **Relief was denied**.

(8) Date of result:  **11/16/2010**

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court:

(2) Docket or case number

(3) Date of filing

(4) Nature of the proceeding:

(5) Grounds raised:

iv

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?  **No**

(7) Result:

(8) Date of result

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court:

(2) Docket or case number:

(3) Date of filing:

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your petition, application, or motion: **No**

(7) Result:

(8) Date of result:

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:

**Yes  PC-2010-1178, affirming denial April 25th 2010**

(2) Second petition: **N/A**

(3) Third petition: **N/A**

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

**Petitioner did appeal**.

**GROUND ONE:  Fifth Amendment, Clause III violation**
(a) Supporting facts

**See GROUND ONE, Page 10**

(b) If you did not exhaust your state remedies on Ground One, explain why: **N/A**

(c) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**Yes**

(2) If you did not raise this issue in your direct appeal, explain why: **N/A**

(d) Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

**Yes raised in Direct Appeal and Post Conviction Relief**

(2) If your answer to Question (d) (1) is "Yes," state:

Type of motion or petition:

**Application for Post-Conviction Relief**

Name and location of the court where the motion or petition was filed:

**Tulsa District Court**

Docket or case number:

**CF-2003-4213**

Date of the court's decision:
**November 16th 2010**

Result (**attach a copy of the court's opinion or order, if available**): **RELIEF DENIED**

(2) Did you receive a hearing on your motion or petition?

**No**

(3) Did you appeal from the denial of your motion or petition?

**Yes**

(4) If your answer to Question (d) is "Yes," did you raise this issue in the appeal?

**Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed:

**O.C.C.A., Oklahoma City, OK**

Docket or case number

**PC-2010-1178**

Date of the court's decision:

**April 25th 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: No other State remedy is available, that is proper instrument or process to challenge this claim.

**GROUND TWO: Title 18 U.S.C. § 6002 Violations**

(a) Supporting facts: **See GROUND TWO, Page 33**

(b) If you did not exhaust your state remedies on Ground Two, explain why: **N/A,**

**FULLY EXHAUSTED**

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

      **Yes**

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court? Both Direct Appeal and Post-Conviction.

      **Yes**

(2) If your answer to Question (d) (1) is "Yes," state :Type of motion or petition:

      **Application for Post-Conviction Relief**

Name and location of the court where the motion or petition was filed:

      **Tulsa County District Court**

Docket or case number:

      **CF-2003-4213**

Date of the court's decision:

      **November 16th 2010**

Result (**attach a copy of the court's opinion or order, if available**): **RELIEF DENIED**

(3) Did you receive a hearing on your motion or petition?

      **No**

(4) Did you appeal from the denial of your motion or petition?

**Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal?

**Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed:

**O.C.C.A, Oklahoma City, OK**

Docket or case number (if you know):

**PC-2010-1178**

Date of the court's decision:

**April 25th 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue:

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus,

administrative remedies, etc.) that you have used to exhaust your state remedies on

Ground Two **No other State remedies exists.**

**GROUND THREE: Immunity Contract Violation**

(a) Supporting facts: **See GROUND THREE, Page 59**

(b) If you did not exhaust your state remedies on Ground Three, explain why?

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

      **Yes**

(2) If you did not raise this issue in your direct appeal, explain why: **N/A**

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

      **Yes, both Direct Appeal and Post-Conviction.**

(2) If your answer to Question (d) (1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

      **Tulsa County District Court**

Docket or case number (if you know):

      **C F-2003-4213**

Date of the court's decision:

      **November 16th 2010**

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition? **NO**

(4) Did you appeal from the denial of your motion or petition? **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal?

**YES**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed: **O.C.C.A. Oklahoma City,**

**OK**

Docket or case number

   **PC-2010-1178**


Date of the court's decision:

**April 25th 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

 (7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue**: N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus,

administrative remedies, etc.) that you have used to exhaust your state remedies on

Ground Three: **No other State remedy exists.**

**GROUND FOUR:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

(a) Supporting facts: **See GROUND FOUR, Page 67**

(b) If you did not exhaust your state remedies on Ground Four, explain why: **N/A**

(c) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**Not possible to raise ineffective of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court? **Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

        **November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion?  **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed: **O.C.C.A., Oklahoma City,**

**Oklahoma**

Docket or case number (if you know):

    **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus,
administrative remedies, etc.) that you have used to exhaust your state remedies on
Ground Four:
**No other State remedies exist.**

**GROUND FIVE:**
**INNEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL,**
**Sixth, Eighth, Fourteenth, and Fifth Amendment Violations**

(a) Supporting facts: **See GROUND FIVE, Page 82**

(b) If you did not exhaust your state remedies on Ground Five, explain why: **N/A**

(c) **Direct Appeal of Ground Five:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, it is not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**It is not possible to raise ineffective assistance of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court? **Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

       **November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion?  **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed:

**O.C.C.A., Oklahoma City, Oklahoma**

Docket or case number (if you know):

**PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Five:

**No other State remedies exist.**

**GROUND SIX:**
(a) Supporting facts

     **See GROUND SIX, Page 88**

(b) If you did not exhaust your state remedies on Ground Six, explain why: **N/A**

(c) **Direct Appeal of Ground Six:**

     (1) If you appealed from the judgment of conviction, did you raise this issue?

     **Yes**

     (2) If you did not raise this issue in your direct appeal, explain why: **N/A**

(d) Post-Conviction Proceedings:

     (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

     **Yes raised in Direct Appeal and Post Conviction Relief**

     (2) If your answer to Question (d) (1) is "Yes," state:

Type of motion or petition:

     **Application for Post-Conviction Relief**

Name and location of the court where the motion or petition was filed:

     **Tulsa District Court**

Docket or case number:

     **CF-2003-4213**

Date of the court's decision:
     **November 16th 2010**

Result (**attach a copy of the court's opinion or order, if available**): **RELIEF DENIED**

     (2) Did you receive a hearing on your motion or petition?

     **No**

(3) Did you appeal from the denial of your motion or petition?

**Yes**

(4) If your answer to Question (d) is "Yes," did you raise this issue in the appeal?

**Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed:

**O.C.C.A., Oklahoma City, OK**

Docket or case number

**PC-2010-1178**

Date of the court's decision:

**April 25th 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Six:

**No other State remedy is available, that is proper instrument or process to challenge this claim.**

**GROUND SEVEN:**

(a) Supporting facts

**See GROUND SEVEN, Page 89**

(b) If you did not exhaust your state remedies on Ground Seven, explain why: **N/A**

(c) **Direct Appeal of Ground Seven:**

(5) If you appealed from the judgment of conviction, did you raise this issue?

**Yes**

(2) If you did not raise this issue in your direct appeal, explain why: **N/A**

(d) Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

**Yes raised in Direct Appeal and Post Conviction Relief**

(2) If your answer to Question (d) (1) is "Yes," state:

Type of motion or petition:

**Application for Post-Conviction Relief**

Name and location of the court where the motion or petition was filed:

**Tulsa District Court**

Docket or case number:

**CF-2003-4213**

Date of the court's decision:
**November 16th 2010**

Result (**attach a copy of the court's opinion or order, if available**): **RELIEF DENIED**

(6) Did you receive a hearing on your motion or petition?

**No**

xviii

(7) Did you appeal from the denial of your motion or petition?

**Yes**

(8) If your answer to Question (d) is "Yes," did you raise this issue in the appeal?

**Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed:

**O.C.C.A., Oklahoma City, OK**

Docket or case number

**PC-2010-1178**

Date of the court's decision:

**April 25th 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Seven:

**No other State remedy is available, that is proper instrument or process to challenge this claim.**

.

**GROUND EIGHT:**
**Petitioner's conviction was obtained by abuse of discretion of State Courts**

(a) Supporting facts: **See GROUND EIGHT, Page 89**

(b) If you did not exhaust your state remedies on Ground Eight, explain why: **N/A**

(c) **Direct Appeal of Ground Eight:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, it is not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**It is not possible to raise ineffective assistance of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court? **Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

       **November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion? **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed:

**O.C.C.A., Oklahoma City, Oklahoma**

Docket or case number (if you know):

     **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Eight:

**No other State remedies exist.**

**GROUND NINE:**
**The District Court Erred by Abdicating its Authority**

(a) Supporting facts: **See GROUND NINE, Page 95**

(b) If you did not exhaust your state remedies on Ground Nine, explain why: **N/A**

(c) **Direct Appeal of Ground Nine:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, it is not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**It is not possible to raise ineffective assistance of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court? **Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

  **November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion?  **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed:

**O.C.C.A., Oklahoma City, Oklahoma**

Docket or case number (if you know):

 **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Nine:

**No other State remedies exist.**

**GROUND TEN:**
**Fundamental Procedural Due Process Violation**

(a) Supporting facts: **See GROUND TEN, Page 96**

(b) If you did not exhaust your state remedies on Ground Ten, explain why: **N/A**

(c) **Direct Appeal of Ground Ten:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, it is not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**It is not possible to raise ineffective assistance of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court? **Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

      **November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion?  **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed:

**O.C.C.A., Oklahoma City, Oklahoma**

Docket or case number (if you know):

> **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Ten:

**No other State remedies exist.**

**GROUND ELEVEN:**
**District Court Error**

(a) Supporting facts: **See GROUND ELEVEN, Page 96**

(b) If you did not exhaust your state remedies on Ground Eleven, explain why: **N/A**

(c) **Direct Appeal of Ground Eleven:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, it is not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**It is not possible to raise ineffective assistance of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court**? Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

      **November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion? **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed:

**O.C.C.A., Oklahoma City, Oklahoma**

Docket or case number (if you know):

   **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Eleven:

**No other State remedies exist.**

**GROUND TWELVE:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

(a) Supporting facts: **See GROUND TWELVE, Page 97**

(b) If you did not exhaust your state remedies on Ground Twelve, explain why: **N/A**

(c) **Direct Appeal of Ground Twelve:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**Not possible to raise ineffective of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court**? Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

   **November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion? **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed: **O.C.C.A., Oklahoma City,**

**Oklahoma**

Docket or case number (if you know):

      **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus,
administrative remedies, etc.) that you have used to exhaust your state remedies on
Ground Twelve:
**No other State remedies exist.**

**GROUND THIRTEEN:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

(a) Supporting facts: **See GROUND THIRTEEN, Page 98**

(b) If you did not exhaust your state remedies on Ground Thirteen, explain why: **N/A**

(c) **Direct Appeal of Ground Thirteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**Not possible to raise ineffective of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court**? Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

**November 16**[th] **2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion? **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed: **O.C.C.A., Oklahoma City,**

**Oklahoma**

Docket or case number (if you know):

     **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Thirteen:
**No other State remedies exist.**

xxxi

**GROUND FOURTEEN:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

(a) Supporting facts: **See GROUND FOURTEEN, Page 99**

(b) If you did not exhaust your state remedies on Ground Fourteen, explain why: **N/A**

(c) **Direct Appeal of Ground Fourteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**Not possible to raise ineffective of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court**? Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

**November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion?  **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed: **O.C.C.A., Oklahoma City,**

**Oklahoma**

Docket or case number (if you know):

     **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Fourteen:
**No other State remedies exist.**

**GROUND FIFTEEN:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

(a) Supporting facts: **See GROUND FIFTEEN, Page 100**

(b) If you did not exhaust your state remedies on Ground Fifteen, explain why: **N/A**

(c) **Direct Appeal of Ground Fifteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**Not possible to raise ineffective of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court**? Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

      **November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion?  **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed: **O.C.C.A., Oklahoma City,**

**Oklahoma**

Docket or case number (if you know):

    **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Fifteen:
**No other State remedies exist.**

**GROUND SIXTEEN:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

(a) Supporting facts: **See GROUND SIXTEEN, Page 101**

(b) If you did not exhaust your state remedies on Ground Sixteen, explain why: **N/A**

(c) **Direct Appeal of Ground Sixteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**Not possible to raise ineffective of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court**? Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

**November 16<sup>th</sup> 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion? **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed: **O.C.C.A., Oklahoma City,**

**Oklahoma**

Docket or case number (if you know):

     **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Sixteen:
**No other State remedies exist.**

**GROUND SEVENTEEN:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

(a) Supporting facts: **See GROUND SEVENTEEN, Page 101**

(b) If you did not exhaust your state remedies on Ground Seventeen, explain why: **N/A**

(c) **Direct Appeal of Ground Seventeen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**Not possible to raise ineffective of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court**? Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

  **November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion?  **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed: **O.C.C.A., Oklahoma City,**

**Oklahoma**

Docket or case number (if you know):

      **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Seventeen:
**No other State remedies exist.**

**GROUND EIGHTEEN:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

(a) Supporting facts: **See GROUND EIGHTEEN, Page 103**

(b) If you did not exhaust your state remedies on Ground Eighteen, explain why: **N/A**

(c) **Direct Appeal of Ground Eighteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**Not possible to raise ineffective of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court? **Post-Conviction Relief Application in state Court. Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

**November 16ᵗʰ 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

xl

(4) Did you appeal from the denial of your motion?  **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed: **O.C.C.A., Oklahoma City,**

**Oklahoma**

Docket or case number (if you know):

     **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus,
administrative remedies, etc.) that you have used to exhaust your state remedies on
Ground Eighteen:
**No other State remedies exist.**

**GROUND NINETEEN:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

(a) Supporting facts: **See GROUND NINETEEN, Page 104**

(b) If you did not exhaust your state remedies on Ground Nineteen, explain why: **N/A**

(c) **Direct Appeal of Ground Nineteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**Not possible to raise ineffective of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court**? Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

**November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion? **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed: **O.C.C.A., Oklahoma City,**

**Oklahoma**

Docket or case number (if you know):

   **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus,
administrative remedies, etc.) that you have used to exhaust your state remedies on
Ground Nineteen:
**No other State remedies exist.**

**GROUND TWENTY:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

(a) Supporting facts: **See GROUND TWENTY, Page 104**

(b) If you did not exhaust your state remedies on Ground Twenty, explain why: **N/A**

(c) **Direct Appeal of Ground Twenty:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**Not possible to raise ineffective of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court**? Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

        **November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion? **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed: **O.C.C.A., Oklahoma City,**

**Oklahoma**

Docket or case number (if you know):

　　　**PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus,
administrative remedies, etc.) that you have used to exhaust your state remedies on
Ground Twenty:
**No other State remedies exist.**

**GROUND TWENTY-ONE:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

(a) Supporting facts: **See GROUND TWENTY-ONE, Page 105**

(b) If you did not exhaust your state remedies on Ground Twenty-One, explain why: **N/A**

(c) **Direct Appeal of Ground Twenty-One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**Not possible to raise ineffective of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court**? Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

       **November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion?  **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed: **O.C.C.A., Oklahoma City,**

**Oklahoma**

Docket or case number (if you know):

**PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Twenty-One:
**No other State remedies exist.**

**GROUND TWENTY-TWO:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

(a) Supporting facts: **See GROUND TWENTY-TWO, Page 106**

(b) If you did not exhaust your state remedies on Ground Twenty-Two, explain why: **N/A**

(c) **Direct Appeal of Ground Twenty-Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**Not possible to raise ineffective of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court**? Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

**November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion?  **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed: **O.C.C.A., Oklahoma City,**

**Oklahoma**

Docket or case number (if you know):

     **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus,
administrative remedies, etc.) that you have used to exhaust your state remedies on
Ground Twenty-Two:
**No other State remedies exist.**

**GROUND TWENTY-THREE:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

(a) Supporting facts: **See GROUND TWENTY-THREE, Page 110**

(b) If you did not exhaust your state remedies on Ground Twenty-Three, explain why:

**N/A**

(c) **Direct Appeal of Ground Twenty-Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

**No, not possible to raise ineffective of appellate counsel in Direct Appeal.**

(2) If you did not raise this issue in your direct appeal, explain why:

**Not possible to raise ineffective of appellate counsel in Direct Appeal.**

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas

corpus in a state trial court? **Post-Conviction Relief Application in state Court.**

**Yes**

(2) If your answer to Question (d) (1) is "Yes," state: **Post-Conviction Relief**

**Application**

Type of motion or petition: **Post-Conviction Relief Application**

Name and location of the court where the motion or petition was filed: **Tulsa County**

**District Court**

Docket or case number: **CF-2003-4213**

Date of the court's decision:

      **November 16th 2010**

Result (attach a copy of the court's opinion or order, if available): **Relief Denied**

1

(3) Did you receive a hearing on your motion or petition? **No**

(4) Did you appeal from the denial of your motion?  **Yes**

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal? **Yes**

(6) If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the appeal was filed: **O.C.C.A., Oklahoma City,**

**Oklahoma**

Docket or case number (if you know):

     **PC-2010-1178**

Date of the court's decision:

**April 25, 2011**

Result (attach a copy of the court's opinion or order, if available): **RELIEF DENIED**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did

not raise this issue: **N/A**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus,
administrative remedies, etc.) that you have used to exhaust your state remedies on
Ground Twenty-Three:
**No other State remedies exist.**

li

**13.** Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?

**Yes**

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them:

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, ground or grounds have not been presented, and state your reasons for not presenting them:

**N/A**

**14.** Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?

**No**

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available.

**15.** Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?

**NO**

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the raised. N/A

**16.** Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:

> **M.I. Aston**
> 3242 E. 30th Place
> Tulsa, OK 74114

(b) At arraignment and plea:

> **M.I. Aston**          **and**      **Steve Hightower**
> 3242 E. 30th Place               2642 E 21st St
> Tulsa, OK 74114                  Tulsa, OK 74114

> **Pre-trial Hearing:**           **Kevin Adams**
>                                  406 S. Boulder, #400
>                                  Tulsa, OK 74103

(c) At trial:

> **Thomas Mortensen and Patrick Adams**
> 1331 S Denver Ave, Tulsa, OK 74119

(d) At sentencing:

> **Thomas Mortensen, Patrick Adams   and      Gloyd McCoy**
> 1331 S Denver Ave, Tulsa, OK 74119           600 Skyridge Trail, Noble, OK 73068

(e) On appeal:

> **Gloyd McCoy**
> 600 Skyridge Trail, Noble, OK 73068

(f) In any post-conviction proceeding:

(g) On appeal from any ruling against you in a post-conviction proceeding:
> **M.I. Aston**
> 3242 E. 30th Place
> Tulsa, OK 74114

**17**. Do you have any future sentence to serve after you complete the sentence for the Judgment that you are challenging?

> **No**

(a) If so, give name and location of court that imposed the other sentence you will serve in the future: N/A
(b) Give the date the other sentence was imposed: N/A

(c) Give the length of the other sentence: N/A

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? **No**

**18**. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

**This Petition is timely and is not barred.**

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

## STATEMENT OF FACTS
The crux of the conspiracy to violate Petitioner's constitutional rights is as follows.

Following is a brief biography of the parties involved:

- Gordon Todd Skinner is the Petitioner and has an immunity contract with the United States Department of Justice.

- Krystle Cole (a.k.a. Ms. Cole, Ms. Skinner, Ms. Cole-Skinner, "Kris", Skinner's wife, and Skinner's girlfriend) is a co-defendant in instant case. Ms. Cole was totally unknown to DEA prior to Petitioner introducing her to DEA agents.

- Karl Nichols is a DEA ("Drug Enforcement Administration") agent out of the San Francisco Bay offices. He met Petitioner after "Letter in *Kastigar*" had been issued by United States Department of Justice Deputy Attorney John Roth. Agent Nichols was exposed to immunized information and immunized conduct for years.

- Andy Langen is a DEA Agent current office unknown. He was out of Kansas City Office.

- Eric Watson is a DEA Agent out of Kansas City office.

- Roger Hanzlik is a DEA agent out of Kansas City office. Agent Hanzlik was introduced to Petitioner after immunity contract was entered into. DEA Agent Hanzlik had been involved in serious immunity violations prior to instant case. Agent Hanzlik threatened Petitioner at Federal Court House.

- AUSA (Assistant United States Attorney) Greg Hough is out of the Topeka U.S. Attorney's office. Petitioner filed complaint about misconduct of AUSA Hough. Petitioner was threatened by AUSA Hough; threat was carried out and made real in the form of the instant case. AUSA Hough was directly involved in many serious immunity and ethical violations prior to the instant violation.

- Doug Kidwell was a DEA Agent out of Tulsa office. Agent Kidwell is alleged to have been a friend of Agent Hanzlik. Agent Kidwell was at the center of the immunity violation. Agent Hanzlik contacted Agent Kidwell to begin a major investigation. Agent Kidwell interviewed most of the key witnesses and interviewed Petitioner after the alleged crime. Agent Kidwell assisted Tulsa Police Detective Watkins in the instant case. Agent Kidwell was the main instrument of the current immunity violation.

- AUSA Allen Litchfield is out of the Tulsa U.S. Attorney's Office. AUSA Litchfield worked previously in Tulsa District Attorney's Office with ADA Dave Robertson and Detective Watkins. AUSA Litchfield has known Petitioner since 1978. AUSA Litchfield had a dislike for Petitioner for years. Petitioner filed reports on AUSA Litchfield to

1

Office of Executive Management- U.S. DOJ in 1980's.  AUSA Litchfield maintained files on Petitioner.  These files were ordered turned over, a portion going back to at least 1997 were never handed over to Petitioner.  These files were covered by immunity, which AUSA Litchfield was well aware of.  Petitioner is in process of requesting a Federal Grand Jury investigate AUSA Litchfield.  Petitioner has filed complaints to Office of Professional Responsibility concerning AUSA Litchfield.  AUSA Litchfield was at the center of the immunity violation and was at the center of the cover up.

- William Hauck (a.k.a. Bill) is a co-defendant in the instant case.  Bill Hauck contacted Petitioner for the first time in over eight years in mid June of 2003.  This contact occurred after Krystle Cole was debriefed DEA on 12 June 2003.  Bill Hauck was at the center of immunity violation.  Hauck is referred as "Truck Driver".  From 1991-1992 Hauck worked for Petitioner's Mother's corporation.

- Brandon Green was the alleged victim in this case.  Brandon Green had dated Krystle Cole for a short time.  Brandon Green had known Petitioner for less than 60 days when alleged crime occurred.

- Christy Roberts (a.k.a. "Chris" Kristi, Christi, and Ms. Roberts) had known Brandon Green for 90 days or less when alleged event occurred.  Christy Roberts dated Petitioner for a short time, less than three weeks.  Christi Roberts had known Petitioner for less than 60 days.

- Betty Stetler had known Petitioner for less than two weeks prior to her interview by AUSA Allen Litchfield.  Ms. Stetler was the girlfriend of Chris Wright.

- Assistant District Attorney ("ADA") Dave Robertson is the first ADA to prosecute this case and worked with AUSA Litchfield in the late 1980s and early 1990s.  He did not finish prosecuting the case as he was required to find a job elsewhere.

- ADA James "Mickey" Hawkins is the co-prosecutor with ADA Robertson.  ADA Hawkins turned the case over to ADA Jack Thorp.

- ADA Jack Thorp is the last ADA assigned prior to trial and prosecuted the case at trial.

- Michael I. Aston is an attorney who has worked on and off for Petitioner since 2003.  Mr. M.I. Aston is the son of H.I. Aston.

- H.I. Aston is an attorney who has worked for Petitioner's family corporations since the 1960's.  H.I. Aston was at July 8, 2003 meeting with DEA.

- Kevin Adams – hired counsel for Petitioner from January 2005 until August 2005.

- Patrick Adams – appointed counsel for Petitioner from November 2005 until July 2006.

2

- Thomas Mortensen – appointed counsel for Petitioner from November 2005 until July 2006.

- Stephen Hightower was hired counsel for a short time between October 2004 and December 2004.

- Gloyd McCoy was hired on July 6, 2006 to perfect appeal for Petitioner. Mr. McCoy was working for Riggs/Abney at the time.

Kansas City DEA Agents Langen and Watson, who were working with Assistant United States Attorney ("AUSA") Hough (Topeka, KS) and Special Agents ("SA") Karl Nichols (Oakland, CA), flew to San Francisco California in February of 2001 to meet with Petitioner.[1] After that extensive debriefing, Agents Langen and Watson asked Petitioner to bring in Krystle Cole as an additional confidential informant, which petitioner subsequently did.  Petitioner introduced Agents Langen and Watson to Krystle Cole.[2]  Agents Langen and Watson debriefed Cole and made her a deal to work *against* Petitioner in the future after the Pickard trial.[3]

Less than two months after the Pickard trial, Cole contacted the Kansas City DEA office as she had been instructed.[4]  By that time, Agent Langen had transferred to another operation so she (Cole) spoke with Agent Eric Watson. Agent Watson expressed to Cole that such a deal was outside his jurisdiction and would create serious immunity problems.[5]  At the time Agent Watson was speaking with Cole, another agent in the Kansas City DEA office, Roger Hanzlik, overheard Watson's conversation with Cole. Subsequently, Agent Hanzlik asked Watson what the

---

[1] Emails- O.R. #232, Bottom of Bates Stamped 38 (p.2) (last 8 lines)

[2] Transcript of August 8, 2006, *Kastigar* hearing, p.10, L11-22; also, Transcript of Hearing on June 6, 2006, p.9, L23-p. 12, L9 and p. 15, L12-21 (Note, this is actually the cross-examination of Cole at the *Kastigar* hearing, but it is not correctly titled on the first page).

[3] Transcript of Hearing on June 6, 2006, p.12, L12-22.

[4] O.R. #204 (DEA-6 Form), Items #1 and #2.

[5] Transcript of Hearing on June 6, 2006, p.16, L6-23.

3

discussion was about. Agent Hanzlik then proceeded to call Cole and began working with her against Petitioner.[6]  As part of his efforts, Agent Hanzlik called Tulsa Field Office ("TFO") agent Doug Kidwell, who is Hanzik's "friend" in the Tulsa DEA office, and made an appointment for Cole to meet with Kidwell.[7]

This clearly shows that the investigation and investigators of the instant case are directly related to the immunized investigation[8] that began in October 2000.  Furthermore, it is clearly shown to be a premeditated, malicious conspiracy to deprive Petitioner of his liberty.[9]

The following chronology traces the history of the investigation, making clear the numerous instances of *Kastigar* violations and violations of Petitioner's constitutional due process rights:

1. Petitioner was granted immunity in October 2000.

*See contract between Skinner, Haney and Roth, O.R. #92-#93*

2. At DEA Agent Nichols' request, Skinner brings in Krystle Cole.
    a. *Kastigar* Transcript, June 12, 2006, Krystle Cole, p. 9, L23-p.10, L2; p.10, L15-20.

    ```
    [Thomas Mortensen questioning Krystle Cole]
    Q: Okay.  How did you hear the name Karl Nichols?  How
      did you first
      Come about to know he existed?

    A: From Todd.

    Q: All right.  And when did you hear that name Karl
      Nichols?

    A: Before I had gone in to meet with him…
    ```

---

[6] Transcript of Hearing on June 6, 2006, p.16, L13-15; see also O.R. #204, Item #1.

[7] Email on July 16, 2003, from Karl Nichols to Alan Litchfield (O.R. #232- #233)

[8] O.R.#233.

[9] Rork Letter (Attachment of Post Conviction)  (P.C.O.R.  471-472)

```
Q: And these meetings were set up and you heard of
   these agents through Todd Skinner?

A: Yes.
Q: Had it not been for Todd Skinner, do you think you
   would have met with these agents?

A: Probably not.
```

Obviously Cole and Nichols only became aware of each other through Todd Skinner, and only after he was granted immunity by the government.

  b. *Kastigar* Transcript, August 8 – August 9, 2005, Gordon Todd Skinner, pages 8-16,

     particularly p.9, L3-7 and p.10, L11-22:

```
[Kevin Adams questioning Gordon Todd Skinner]
Q: Okay. Now, specifically, I'd like to talk about
   Karl Nichols.

A: Well, I should say that when I get to the meeting
   before I ever even gave my name, I also pled the
   Fifth, so that kicked in the Kastigar even further,
   so…

Q: And the question was did there come a time when you
   introduced Ms. Skinner to the DEA?

A: I was - - they were worried about a speedy trial by
   the defendants.  They asked me to bring in any and
   all witnesses that I could to help with their case.
   And I started bringing in, physically, witnesses,
   and I brought Krystle Cole in the month of January,
   2001.
```

 3. In 2001 DEA Agent Langen offered Krystle Cole a deal to work against Skinner in the

    future.

  a. *Kastigar* Transcript, June 6, 2006, page 12, lines 12-22, Krystle Cole (Cross):

```
[Thomas Mortensen questioning Krystle Cole]
Q: And any of these DEA agents that I just named,
   described, we talked about, did any of them ever ask
   you if you wanted to work against Todd Skinner?
```

A: Yes.

Q: What agent told that to you, and approximately what time frame are we talking about?

A: Eric and Andy during – during the investigation whenever I was interviewed about – about the Overton case the first time with them they mentioned it and then later whenever I had to talk with them again about the Tanasis case specifically when they came to Tucson they mentioned it again.

b. *Kastigar* Transcript, August 8 – August 9, 2005, page 12, lines 10-25; pg. 13, lines

24-25; pg. 14, lines 1-25:

[Kevin Adams questioning Gordon Todd Skinner]

Q: Did there come a time when you learned that they had approached her about cooperating against you, and can you tell us about that.

A: Yes.  It was February of 2001, and it was a continual statement coming back to me from every witness, every witness said, every single DEA agent that meets with us is trying to find out dirt on you and wants us to cooperate with [them against] you. I made a formal complaint with the Department of Justice in Washington D.C. and they  - - that behavior stopped…

Q: Can you tell us, specifically, who requested her to cooperate against you?

A: Andy Langen.

Q: Okay. Now, did you ever testify in relation to the immunity agreement that you received back in October of 2000?

A: Yes, I did, in the year 2003.

Q: And which case did you happen to testify in?

A: It was headed as a William Leonard Pickard - -
United States versus William Leonard Pickard and
Clyde Apperson, with their aliases there…

Q: Okay.  And which DEA agents were present when you
testified?

A: …they were Karl Nichols and Roger Hanzlick.

Q: Okay.  And this is the same Karl Nichols that you
referred to earlier?

A: Yes, sir…

Q: Was [Krystle Cole Skinner] exposed to your *Kastigar*
testimony?

A: Yes…

4.   Cole contacted the DEA office in Kansas City to take the DEA up on its offer to bring

Cole in as a Source of Information ("SOI") against Skinner in June of 2003.  *Kastigar*

Hearing Transcript, June 12, 2006, p.15, L25- p.16, L23; and DEA Agent Hanzlik (K.C.

Office) contacts Tulsa DEA Agent Kidwell to set up meetings on June 12, 2003. *See*

*Bates Stamped #331-#333; O.R. #204-206; DEA-6 form, points #1-#3:*

[Thomas Mortensen questioning Krystle Cole]
Q: Okay.  I'd like to fast forward a little bit and ask
you if you know a Roger Hanzlick?

A: Yes.

Q: Okay.  Do you know a Doug Kidwell?

A: Yes.

Q: Who are these people?

A: Roger Hanzlik is the DEA agent in Kansas City that –
okay.  At first whenever I was trying to go to the DEA
here, I – I didn't go to the DEA here first.  I went
to Kansas because I wanted to call Eric and Andy
because they had in the past said, do know, if you

```
            ever have anything on Todd, let us know if you are
            willing to help us or whatever.  And so I called them
            because I figured they were who I should call , and so
            they said , well, we can't do this, it's out of our
            jurisdiction, but why don't you talk to Roger because
            Roger will be able to get you in touch with somebody
            down there or whatever.  So then they pretty much just
            passed the buck –

    A: …They basically passed it off to Roger.  So then I
       talked to Roger, and Roger told me to go to Doug
       Kidwell here in Oklahoma, that it wasn't in the Kansas
       jurisdiction but that I could go in and he set up an
       appointment for me with Doug Kidwell.
                           ………

    1. On 006/12/2003, S/A Roger Hanzlick, DEA Kansas City,
       contacted the DEA Tulsa Resident Office in reference
       to Krystal Ann Cole.  COLE had been involved in a case
       that DEA K.C. had worked on in the past.  COLE had
       contacted DEA K.C. in reference to providing them with
       information on Gordon Todd SKINNER.
                      ………
    3. COLE contacted TFO Doug Kidwell on the same date and
       arrangements were made for her to come in for an
       interview.
```

This proves that the investigation that began in June, 2003 is a **related investigation to the investigation from 2000 from which Skinner's immunity arose**. Cole gave the names of Skinner, Green, Picard, Wynn, Hickman, and Bear, but NOT William Hauck or Betty Strater. This is because Cole did not know them, on June 12, 2003.  Proof that Cole did not give DEA information on Hauck: See *Kastigar* Transcript, June 12, 2006, pg. 47, lines 5-8, Krystle Cole (cross):

```
    [Thomas Mortensen questioning Krystle Cole]
    Q: Okay.  And this information that you collected for the
       DEA, did it involve William Hauck?

    A: I never knew who William Hauck was until I came back
       from Vegas.
```

8

And the following proves that Stetler did not meet Skinner or Cole until June 21, 2003:

*See O.R. #226-#230 (DEA-6 form,  Bates stamped #345-#349), particularly  O.R. #226, point #5 and O.R #227, point #16*   <Note: Recall that Cole is introduced to DEA by Skinner in January 2001, **much earlier** than that date. See <u>no 2.b.,</u> above.>:

```
5. Stetler related that her first meeting with SKINNER had
   taken place at Chris Wright's house, located in the 5300
   block of South Peoria area, on 06/21/2003…

16. On 06/27/2003 Stetler and Wright met SKINNER and
    Krystal COLE…
```

Brandon Green is debriefed **after** Cole is debriefed. See O.R. #208, point #2:

```
    2. GREEN had brought his girlfriend, Krystal Ann COLE
       to the TRO so that she could speak to agents in
       reference to Gordon Todd SKINNER.  While there,
       Green decided to also speak to agents.
```

5. Other than a fabricated story about a lab (which would have been covered by immunity) Cole gave information (true/false) on events that occurred prior to Judicial Immunity Grant. *See O.R. # 204-#206*

9

## GROUND ONE:

**FIFTH AMENDMENT, CLAUSE III, AND *KASTIGAR* IMMUNITY VIOLATION**

**LEGAL RIGHTS AND PRIVILEGES OF WHICH PETITIONER WAS DEPRIVED:**

Petitioner was denied the protection against self-incrimination guaranteed by the Fifth

Amendment to the U.S. Constitution, the United States Code, and the Oklahoma Constitution in

Article II § 21.

## FACTS OF THE CASE / ERRORS MADE BY:

This claim was raised in Direct Appeal; however, O.C.C.A.[10] had an unreasonable

determination of clearly established facts in the record. By failing to recognize "subsequent

meetings" aspect of Petitioner's Immunity Contract and fact that Petitioner met with the DEA on

July 8, 2003, after the alleged events of kidnapping and assault occurred. It was raised in Post-

Conviction Relief Proceedings and in pretrial *Kastigar* hearings.

```
(2) In exchange for your agreement to cooperate with the
undersigned and/or other federal agents, the United States
Department of Justice, narcotic and Dangerous Drug Section
agrees that no statement or other information (including
documents) given by you during this and subsequent meetings
will be used directly or indirectly against you in any
criminal case, as those terms are understood in 18 U.S.C.
§6002, subject to the provisions of this letter. (Emphasis
added.)
```

O.C.C.A. failed to address this issue, even though the claim and the facts were raised time and

time again. *See,* item no. 2, O.R. pp.92-93, 197-198, 341-342. By failing to identify the correct

set of facts which were clearly in the record O.C.C.A. violated Title 28 U.S.C. § 2254 (d) (2),

therefore review *de novo* is mandatory.

---

[10] Judge Chapel who wrote the Opinion for O.C.C.A. had a major conflict of interest with Petitioner, Mr. McCoy, Riggs/Abbney, and D.A. Harris.

State courts have unreasonably interpreted and applied *Kastigar* to the instant case. *Kastigar* requires that Petitioner "only show that he testified under a grant of immunity in order to shift the heavy burden of proving that all the evidence it proposes to use was derived from legitimate and independent sources." 406 U.S. at 460 (Petitioner was granted immunity under the same statute as Mr. Kastigar.)   Petitioner has met his burden, so the government's burden of proof "is not limited to the negation of taint, rather it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." 406 U.S. 460

Based on the sworn testimony of witnesses shown *infra*, the government cannot possibly meet this burden.

Petitioner has clearly shown that the "testimony [and/] or other information" used to convict him in the instant case was deliberately and maliciously "directly [and/] or indirectly derived" from his own information provided to federal agents while under an immunity agreement binding on the federal government and the State of Oklahoma made in 2000 and again renewed on July 8, 2003 with his subsequent discussion of facts of this case with DEA agents in their office in Tulsa. *See also, Appellant Brief of Gordon Todd Skinner, particularly pp.15-17, OCCA Case # F-2007-1101.*

The motive of the Government has been clearly shown throughout the record, *scilicet:*

> `"and I know 3 DEA agents, a courtroom deputy and an`
> `AUSA that would love to see him imprisoned and the key`
> `thrown away"`

This e-mail (O.R. 233) was sent less than 24 hours prior to alleged discovery of alleged crime.

> `I have etched into my memory, various statements made`
> `by Hough. That include, "You better stop getting in`
> `bed with the defense. I'll see to it that you'll never`
> `be a witness for any law enforcement agency the rest`
> `of your life. You are going to pay big time for the`

```
bedding down with defense. Just you wait and see. This
is the last time you'll ever receive any benefit from
the government. Only hard times the rest of your
life. You should never have to worry about how
powerful the government is, and you'll be made to pay
for this little indiscretion of sleeping with the
defense. You've got to be fucking stupid to think we
won't do whatever it takes, to see that you won't be
of use as a witness for any law enforcement agency
ever again."(Emphasis added.) (P.C.O.R. 471-472) (See
Petition for writ of certiorari to U.S. Supreme Court,
page 7.)
```
Above are statements that William Rork heard AUSA Hough say to Petitioner, while

Petitioner was in Federal Court room.  Further evidence as to malicious motives:

```
[Kevin Adams questioning Gordon Todd Skinner]
Q. Did Mr. Hough make any threats against you at-

A. I was on the stand in front of open court, he said,
  "If it's the last thing I ever do"-
…
  MR. SKINNER: He said, "If it's the last thing I ever
  do, I'll get you back for this." (As found in
  transcript of Kastigar Hearing, August 8 and 9,
  2005, page 16, line 23 through to page 17, line 7.)
  (P.C.O.R. 402)
```

### RELEVANT CITATIONS:

*Kastigar v. U.S.,* 406 U.S. 441 (1972); *Marchetti v. U.S.,* 390 U.S. 39 (1968); *U.S. v.*

*Hubbell*, 530 U.S. 27 (2000); *Murphy v. Waterfront Commission*, 378 U.S. 52 (1964); *Garrity v,*

*New Jersey*, 385 U.S. 493; *Brown v. Walker*, 161 U.S. 591; *U.S. v. North*, 910 F2d 843 (D.C. Cir.

1990); *Elkins v. U.S.*, 364 U.S. 206 (1960); *United States v. Brown*, 763 F. Supp. 1518 (D. Ariz.

1991).

## PROOF OF ABOVE STATED FACTS:

1. DEA agents Doug Kidwell, Rick Weaver, and Special Agent Barnett met with Skinner on July 8, 2003, a date **after** the date(s) on which alleged acts constituting the elements of the conviction Petitioner is appealing occurred:

    *a. Trial Transcript, testimony of William Hauck (Tr.716, L12-14 and Tr.721, L14-722, L2):*

> [ADA Thorp questioning William Hauck]
> Q: All right. Did Todd and Krystle ride down with you?
>
> A: No, sir. Todd claimed that he had a meeting with the DEA the following day and that he –
>
> Q: Okay.
>
> A: -- ended up being down there about 12 hours after me.
>
> …..
>
> Q: How long afterwards did anyone else show up?
>
> A: Todd showed up about 2:00 in the afternoon. I got there about 2:00 in the morning and Todd and Krystle showed up about 2:00 in the afternoon.
>
> Q: I'm sorry. Could we get a clarification on the day that is, 2:00 in the afternoon when?
>
> Q: Do you remember which day?
>
> A: It would have been Tuesday, I'm not sure of the numerical number. It is the day that Todd had his – that he claimed he had a meeting with Doug Kidwell with the DEA in the morning.
>
> Q: All right. Now, Tuesday, July 8th, sound right?
>
> A: Yes. That would probably be the day.

13

b. *Emails (See O.R. #232 (Bates 384, July 16, 2003), #233 (Bates 385, July 10, 2003),*

   *#234 (Bates 386, July 9, 2003)):*

[To:] Allen [Litchfield],
If I can be of any help, please let me know.  Yes there
is an unsatisfactory deactivation report, though I have
to check with my CS coordinator to see what needs to be
done to release that to you.  I spoke with Doug Kidwell,
before Skinner came in, to give him the details of the
guy.  I'll bet you had a very interesting interview.
[From:] Karl [Nichols] *(See O.R. #232, Bates 384, July
16, 2003, 7:40 PM)*

[To:] Gregory G. Hough,
Skinner is up to his old tricks again in his hometown.
**We are looking at him as a target**.  He is trying to head
us off.  I'm certain that nobody will try to use him as a
CI.  Is it possible to get a copy of the memo?  Thanks
AJL [Litchfield]. (See O.R. #233, Bates 385, July 10,
2003, 9:58 AM) (Emphasis added.)

[To:] Allen [Litchfield],
Skinner was involved in an LSD deal.  He and his attorney
got DOJ to give him immunity for his testimony against
the 2 other leaders (Pickard & Apperson).  After his
testimony in the LSD trial in D.Kan., Skinner flipped
back into the arms of his co-conspirators.  This
precipitated a bunch of mini-trials during our trial
wherein Skinner, sponsored by Pickard & Apperson,
testified that the 3 DEA agents, a courtroom deputy and I
all conspired to affect his trial testimony.  Skinner
alleged that, in spite of our best efforts, he testified
truthfully.  However, it was a tremendous distraction,
likely caused OPR investigations of all concerned and, at
the very least, was a breach of his immunity agreement.
In short, Skinner's immunity agreement was limited to the
LSD matter; Skinner breached his immunity agreement and
it is no longer valid and binding on the USA; and **I know
3 DEA agents, a courtroom deputy and an AUSA that would
love to see him imprisoned and the key thrown away.**
Besides that, no government authority should ever trust
Skinner again!!!  In fact, I instructed DEA to have no
contact with Skinner after this incident.  Nichols did a

memo, I believe to all DEA, informing them about this
matter so that Skinner would never be used as a CI again.
The lead DEA agents were Karl Nichols, Oakland, CA, and
Roger Hanzlik, Kansas City.  Either, or both, can shed
additional light on the matter.  If you've got agents
talking to Skinner, they should definitely coordinate
with Nichols and Hanzlik.  [From:] Gregory G. Hough,
O.C.D.E.T.F.  Lead A.U.S.A., District of Kansas. (See
O.R. # 233, Bates 386, **July 10, 2003, 8:24 AM**) (Emphasis
added.)

[To:] Greg Hough,
Can you tell me what this guy [Skinner] was up to?  He
has popped up and walked into DEA claiming all types of
immunity, etc.  Frankly he sounds a little spooky.
[From:] AJL [Litchfield].  (See O.R. # 234, Bates 386,
July 09, 2003, 4:40 PM)

c.  *Kastigar Transcript, August 8 – August 9, 2005, Gordon Todd Skinner, pg. 18, lines*

    *1-14:*

    [Kevin Adams questioning Gordon Todd Skinner]
        A: The appointment [for Skinner to meet with DEA in
        Tulsa] was made for Friday at 9:30 in the morning
        before the July 4th weekend, and the DEA called him
        [Skinner's attorney, Mr. H.I. Aston] back and
        cancelled and said it was a holiday, we can't do it.
        We're having a bunch of people out that day.  And my
        wife, without requesting or telling me about it,
        went ahead and unilaterally changed that date to, I
        believe, July the 7th, the first Tuesday after the
        meeting – I mean, after that July 4th weekend.

The date of the first Tuesday after July 4, 2003 is actually **July 8, 2003**, and that is the

date the meeting in Tulsa between Skinner and the DEA took place.  See *Kastigar* Transcript,

August 8 – August 9, 2005, Gordon Todd Skinner, pg. 22, lines 18-25 and pg. 23, lines 1-6.  A

tape was made of the DEA meeting with Skinner, but was never turned over to defense.

15

2. Later on July 8, 2003, DEA and Assistant United States Attorney ("AUSA") Litchfield met with Betty Stetler (Agents Kidwell and Barnett are present.) Stetler gave information on William Hauck.

   a. *See O.R. #225-230 (Bates Stamped #344-349) , particularly Item #17 (O.R.#228)*(Stetler IDs Hauck); *and Item #18-#20 (O.R.#228)* (Stetler gives additional information on Hauck); *and Item #4 (O.R. #230)*(Initial information noted on Hauck):

      ```
      17. On 06/28/2003 Stetler and Wright met SKINNER,
      COLE, and Bill LNU [Hauck] for lunch at the Fuji
      restaurant, located… Bill was introduced to them by
      SKINNER and they were told Bill was a C.I.A. agent.
      During the meal Bill showed Wright a gun.  After
      lunch Stetler and Wright went back to Wright's
      housewhere Stetler received a call on her cellular
      telephone from Bill wanting to meet with her...

      20. Bill then told her that he would like to kiss her
      but he could not because she was only seventeen (17)
      years old.  Bill also told her that he would like to
      take her to the Cayman Islands but that he could not
      do that because of her age.  Bill and Stetler then
      returned to Wright's house where Bill got back in
      the car with SKINNER and Cole and they left.

      INDEXING
      4. Bill, W/M 5'6", 200lbs., Light features, Short Gray
      Hair, Late 30's Early 40's, NFI. (O.R. 230)
      ```

   b. Stetler gave information on AmeriSuites Hotel (O.R.#227)

   c. AUSA Litchfield listened to the tape of Skinner and was present at the meeting with Stetler, which occurred later on the same day as their July 8th meeting with Skinner.

      *See O.R.# 225, field #9*

    d. DEA Release of Information ("ROI") showing "Bill" at Fuji restaurant meeting was

       Source of Information ("SOI") Bill Hauck. (O.R.#249, Item # 8).

3. On July 10, 2003 (Bates Stamped #350-352), after meeting with Skinner on July 8, 2003,

  and meeting with Stetler on July 8, 2003, Mandy Ray? was interviewed by DEA Agents

  Kidwell and Barnett. Ray gives information on Kristi Roberts? See O.R. #221, point #2,

  point #5; O.R. #222, points #9-#10:

> 2. On 07/10/2003, TFO Doug Kidwell was contacted by
> Det. Wayne Stinett, Claremore Police Department, in
> reference to him having some drugs in his
> procession[sic] that had come from Gordon Todd
> SKINNER.
>
> 5. Ms. Ray stated that she and several of her friends
> play pool in a local bar tournament and that
> approximately three (3) weeks ago a friend of hers,
> Kristi ROBERTS, had come to the bar and had given
> her (Ray), and another friend, Dena (AKA Dino)
> Dobbs, some tannish/brown pills and some capsules
> with white powder in them.
> ...
>
> 9. On the night that ROBERTS had given her the pills
> everyone was 'Tripped out' and that she, Ray, had
> acted that [way] as to as to not offend ROBERTS.
> ROBERTS had called SKINNER at his mother's house in
> Tulsa and that SKINNER had tried to talk her, Ray,
> into coming to the house.  Ray refused to go
> anywhere around SKINNER.
>
> 10. Ray stated that she did not like SKINNER because
> of what he was doing to ROBERTS.  That ROBERTS was
> staying, sometimes with SKINNER at the Doubletree
> Hotel in Tulsa.  That while ROBERTS was seeing
> SKINNER that he had married Krystal Ann COLE and
> that SKINNER had wanted to continue his relationship
> with ROBERTS.  Ray further stated that every time
> [sic] she saw ROBERTS since her meeting with Skinner
> that she was always 'drugged up'.

Mandy Ray gave information on Skinner, Cole, Green, Roberts and the Tulsa Downtown

Doubletree, and this is the first proof in a government document showing DEA's link to Roberts.

See DEA-6 form showing DEA's indexing/accumulation of contacts on *O.R. #222-#223,*

*particularly Item #4*:

> "4. ROBERTS, Kristi Sue, W/F, brown Hair, Green Eyes,
> %'*", 100lbs.,..NADDIS: Negative".

4. On Friday, 7/11/2003, DEA Agents Kidwell, Weaver, Mier, Adcock, and Barnett

   debriefed Kristi Roberts, Laura Ball, and Deno Dobbs at the Pryor Police Department.

   See O.R. #268-#271(Bates Stamped #355-#356). It is important to note that this contact

   was initiated by DEA agents, who detained the women, including Kristi Roberts, through

   a traffic stop. The women didn't just walk into the Pryor Police Department on their own,

   and obviously the district court and prosecutor didn't want any record of this established.

   *See Tr. Vol. III, p.527, L21-25*:

> [ADA Thorp questioning Kristi Roberts]
> Q: Did you talk to the police about this case?
>
> A: At that time, the DEA had pulled us over on
>   Thursday –
>
> **The Court**: Well –
>
> Q: (By [prosecutor]) Let me stop you right there –

These interviews led to investigations of the Doubletree Hotel, Amy Ball, Laura Ball,

Dena Dobbs, storage units by #s, the Ambassador Hotel, and **specifically** to Doubletree Hotel

Room #1411 (the alleged kidnapping room). *See O.R. #270, Item #15*:

```
15. Laura Ball says that on one occasion her sister Amy
Ball did attend one of Todd SKINNER'S parties at the
Doubletree Hotel Room #1409 and she believes this was in
late April or early May of 2003.  Amy Ball was given the
"Official Sacrament" as she has heard it called numerous
times by different people.  Ball says that her sister
told her that Todd SKINNER offered her a wafer or cracker
and was told it contained LSD which would allow her to
get in touch with her true inner feelings.  Amy ball was
then led into an adjacent room which was room number
1411.
```

Kristi Roberts states she met Skinner through a friend. *See O.R. #272, Item #2.*

5.  On 7/12/2003, Laura Ball contacts DEA Agent Weaver to set up a second meeting

between Kristi Roberts and DEA. *See O.R. #272, Point #1*:

6.  On 7/14/2003, Kristi Roberts meets with DEA Agents Weaver, Adcock, Mier, Kidwell,

and Barnett. This meeting is prior to the DEA interview with William Hauck. During this

meeting DEA obtained information on alleged kidnapping of Brandon Green, storage

units, phone numbers, Krystle Cole, Brandon Green, Gordon Todd and Hauck. Skinner.

*See O.R. #272.*

7.  Later, on 7/14/2003, at approximately 3:00 p.m., DEA Agents Weaver and Barnett and

FBI Special Agent Jeremy Sikes met with Mark Green. This meeting took place after

Green spoke with U.S. Attorney David O'Meilia, who informed Green that DEA was the

lead agency on this case. *See O.R. #245, Item #2 and 3*:

```
2. On Monday July 14, 2003, at approximately 3:00 p.m.,
Mark Green, the father of Brandon GREEN, came to the
Tulsa R/O to provide information on his son's condition
to TFO Rick Weaver and FBI SA Jeremy Sikes.
```

```
3. Mark Green stated that he came by Tulsa Resident
   office to speak with Agents concerning Gordon Todd
   SKINNER.  Mark Green stated that he has talked with Mr.
   David O'Melia of the U.S. Attorney's office and the
   Tulsa Police Department concerning SKINNER and they
   informed him to speak with the DEA.
```

It is important to note that Mark Green in another document claimed he was in Texas on this date. A second odd situation is TRACIS report, which said Mark Green called in a report to Detective Watkins of the Tulsa Police Department on July 14, 2003 however both claim on the witness stand that Mark Green came by the office in person. The TRACIS report is dubious at best when inspected for proper IDs, dates and other information. Much later, information learned by Det. Watkins appeared on the report dated 7/14/2003.

Det. Watkins misled/lied to United States Department of Justice ("U.S.D.O.J") employee Dan McGraw (see PSI/PSR) as to the origin of the case, claiming the Doubletree Hotel contacted him. This claim is discredited by the testimony of Doubletree employees and Detective Watkins himself, as well as by his sworn affidavit.

8. On July 14, 2003, William Hauck claimed he contacted the Tulsa DEA from Morgan City, LA as to drug activity of Skinner – labs and such. Hauck had spoken to Kristi Roberts and Skinner. Both people told Hauck of the DEA investigation and the arrest of Kristi Roberts, Laura Ball, and Dena Dobbs. Hauck knew Roberts and Dobbs from July 5, 2003.  Hauck's cell phone records would prove calls to DEA and Roberts, and NONE to Skinner. Skinner requested phone records and Det. Watkins obtained Hauck's records. To this date, such records were never provided to Petitioner or his attorneys.

a. First DEA interview with Hauck was July 16 of 2003.  Proof that Hauck knew Kristi Roberts had been interviewed by DEA. See O.R.#329-#330; and O.R.# 358:

> [Tulsa PD Detective Watkins questioning William Hauck]
> A: ...she's [Kristi Roberts) spoken to the ... the other agency.
>
> Q: And you're talking about the DEA when you say other agency?
>
> A: Yes.

b. July 16, 2003, Tulsa DEA Agents Mieir and Adcock pick Hauck up at the Oklahoma City bus station and take him to the OKC DEA office, where FBI Agent Richard A. Colladi interviews Hauck – the alleged first debrief of William Hauck by **any** law enforcement as to alleged kidnapping of Green and into alleged activities of Skinner. *See O.R. #248-#257(Bates Stamped #362-#371), particularly #248, Item #2*:

> 2. On July 16, 2003 TFO Gayla Adcock and TFO Bob Mieir, along with FBI S/A Richard A. Collodi of the Oklahoma City FBI office interviewed William HAUCK (hereafter referenced as Source of Information or SOI) at the Oklahoma City DEA District Office.

Hauck provides information on Cole, Green, Skinner, Roberts, Wynn, Wright, and Stetler, Doubletree Hotel rooms 1409, 1411, and 1513, and on Premiere Inn (Texas), room #116. Hauck gives information on Skinner's Porsche, Bill Wynn's address and phone numbers, and information Hauck had found on the internet as to Skinner and Boris Olarte. *See O.R. #256, item #37*.

9. On July 18, 2003, DEA Agents Weaver and Barnett, along with FBI Agent Sikes, interview Brandon Green. Green gives his version of the alleged kidnapping, but only

after being filled in by Kristi Roberts. Green does not know Hauck's last name, phone

number, or address. *See O.R.#264-#266:*

> [Detective Watkins questioning Brandon Green]
> Q: Have you talked to Christy Roberts?
>
> A: No.
>
> Q: OK.  Did she tell you about the things that
>    happened?
>
> A: She gave me the entire story [of the alleged
>    kidnapping], and her and I together went to the DEA,
>    and we both gave our testimonies to the DEA.
>    Unfortunately, it was not recorded.
>
> Q: OK.  So Christy, you have talked to her, and she
>    confirmed these things that you already know pretty
>    much?
>
> A: Yes, she filled in all the details.

Proof Brandon Green's testimony was obtained by DEA after Petitioner had been

interviewed by DEA on July 8, 2003, but prior to Tulsa Police interviewing Brandon

Green in mid August, 2003. (***TULSA POLICE INTERVIEW OF GREEN ATTACHED***

***TO FIRST KASTIGAR MOTION*** August 16, 2003) (O.R. 264-266)   Tulsa Police

interview of Brandon Green was conducted after DEA turned over handwritten notes,

background reports and DEA met many times with Tulsa Police Detective Watkins.

Detective Watkins waits more than 45 days after event to interview Brandon Green. The

claim by Detective Watkins that he was waiting for Brandon Green to get better is not

valid as DEA and FBI had no problem interviewing Brandon Green in their [DEA]

offices.  DEA and FBI had interviewed Brandon Green twice in first ten days. This

interview with Brandon Green by DEA and FBI occurred in the time period that DEA

was running investigation of alleged kidnapping. (O.R. DEA 6 FORM with DEA

statement about Mr. David O'Mielia) Detective Watkins admitted obtaining information directly from AUSA Litchfield about details of alleged. (*Kastigar* Hearing Transcript May 25, 2005, Testimony of Detective Watkins, page 62, lines 15-20, O.R. #327) Please read Brandon Green *Kastigar* Hearing on 16 June, 2003, Volume IV, pages 827-852.

Brandon Green *Kastigar* Hearing on 16 June, 2003, Volume IV, page 830, line 3-9:

> [Thomas Mortensen questioning Brandon Green]
> Q. Do you remember the what information you gave them [DEA] during that period of time ?
>
> A. **I tried giving them [DEA] as much information as possible to my kidnapping** and the involvement with Todd. (Emphasis added.)

10. On July 27, 2003, DEA Agents Adcock, Boyd, and Barnett meet with Hauck (*O.R. #218, Items #1 and #2*) and Hauck meets with Skinner (*points #3 and #4*). During this, DEA learned of M. Chasteen phone number address, and of Skinner's hotel:

> On July 27, 2003, TFOs Gayla Adcock and Jolen Boyd met with a Source of Information (hereafter referred to as SOI) regarding a scheduled meeting with Gordon Todd SKINNER and the SOI.

11. On July 31, 2003, Hauck meets with DEA Agents Kidwell, Weaver, and Barnett (*O.R. #258-262*). Hauck gives information of alleged events at Doubletree Hotel. DEA contacts Det. Watkins on July 31, 2003 and gives him information, which is obviously used by Watkins to obtain a warrant.

It is important to note that **on this very day** Watkins executes a search warrant on the Doubletree Hotel room.

12. On May 25, 2005, Corporal Gene Watkins testified during the *Kastigar* hearing in this matter. There were a number of facts established during that hearing. Some of those facts are highlighted below:

> **(1) The DEA Assisted Corporal Watkins in Contacting State's Witness William Hauck**
>
> During the hearing Corporal Watkins testified to this.
>
> [Kevin Adams questioning Tulsa Police Department Detective Watkins]
> Q: …you were able to get into contact with Mr. Hauck through Rick Weaver's assistance?
>
> A: That's correct.

*May 25, 2005 Kastigar hearing Transcript (Testimony of Watkins) pg. 40, Lines 20-22, O.R. #324*

In fact, without assistance from Mr. Weaver, Corporal Watkins was unaware of Mr. Hauck's

identity or existence.

> [Kevin Adams questioning Tulsa Police Department Detective Watkins]
> Q: So you were unaware of Mr. Hauck, even his identity without the assistance of Mr. Weaver?
>
> A: At that time, no, I did not.

*Kastigar Hearing Transcript (Testimony of Watkins) pg. 41, Lines 5-7, O.R.#324*

**b. The DEA Assisted Corporal Watkins in Looking for State's Witness Kristi Roberts**

> [Kevin Adams questioning Tulsa Police Department Detective Watkins]
> Q: Okay, but here's the issue, you contacted the DEA and told them you were looking for Kristi Roberts, and they assisted you in trying to find Kristi Roberts?
>
> A: Correct.

*Kastigar Hearing Transcript (Testimony of Watkins) pg. 41, Lines 22-25, O.R.#324*

**c. The DEA interviewed State's Witness William Hauck and Kristi Roberts concerning the allegations of this case Prior to Corporal Watkins interviewing those witnesses**

24

[Kevin Adams questioning Tulsa Police Department Detective Watkins]

Q: Now, isn't it your understanding that Mr. Hauck had
   already discussed these events with the DEA prior to
   your talking to him?

A: Yes.

Q: Is it your understanding that Kristi Roberts had
   already discussed these events with the DEA prior to
   you talking to him?

A: I know that they had - yes.

*Kastigar Hearing Transcript (Testimony of Watkins) pg. 36, Lines 7-14, O.R.#324-325*

### d.  The DEA turned over notes from their investigation to Corporal Watkins

[Kevin Adams questioning Tulsa Police Department Detective Watkins]

Q: And I want to talk, I don't think it is entirely
   clear, you said that you know you did see some DEA
   reports?

A: Well, I'm not sure.  I didn't see reports.  It
   wasn't DEA reports, it was just some notes that they
   made and I don't -

Q: Okay?  And here's the question:  The notes they
   made was from what?  What were those notes in
   reference?

A: Reference to this case.

Q: Okay.  In reference to this case?

A: Yes.

Q: Okay. And they, who is they?

A: Came from the DEA,…

*Kastigar Hearing Transcript (Testimony of Watkins) pg. 36, Lines 7-14, O.R.#325*

### e.  In addition to the notes the DEA gave Detective Watkins, the DEA turned over a Report on Background Checks of the Witnesses

[Kevin Adams questioning Tulsa Police Department Detective Watkins]

Q: Corporal did you receive anything from the Drug
   Enforcement Agency?

```
A: Later they gave me a report on some of their
   background checks that they had done.
```

*Kastigar Hearing Transcript (Testimony of Watkins) pg. 28, Lines 16-19, O.R.#325-326*

f.   **That Corporal Watkins Had Numerous Contacts with the DEA Agents
     Concerning this Case.  Watkins:**

i.   Contacted DEA Agent Rick Weaver to see if DEA working the case.

[Kevin Adams questioning Tulsa Police Department Detective Watkins]
```
A: ... And I did contact an officer that works for DEA,
   but he's actually a Jenks officer, and I asked him
   if this was a case they were going to be working or
   a case that the City of Tulsa, that we were going to
   be working.
```

*Kastigar Hearing Transcript (Testimony of Watkins) pg. 13, Lines 1-5, O.R.#326*

ii.   Talked with Rick Weaver to see if he could get a hold of truck driver.

[Kevin Adams questioning Tulsa Police Department Detective Watkins]
```
A: ... Well then I contacted  -- I did talk to Mr.
   Weaver, who's the Jenks policeman that was working
   on the DEA task force, and asked him, I said look, I
   said, do you know how I can get a hold of the truck
   driver, Bill?
```

*Kastigar Hearing Transcript (Testimony of Watkins) pg. 19, Line 20 - 24,
O.R.#326*

iii.   Obtained DEA report on background checks.

[Kevin Adams questioning Tulsa Police Department Detective Watkins]
```
Q: Corporal, did you receive anything from the Drug
   Enforcement Agency?

A: Later they gave me a report on some of their
   background checks they had done.
```

*Kastigar Hearing Transcript (Testimony of Watkins) pg. 28, Lines 16-19,
O.R.#326*

iv.   DEA wanted information on Kristi Roberts. *Kastigar Hearing Transcript
      (Testimony of Watkins) pg37, Lines 13-22, O.R.#326*  This establishes Corporal
      Watkins and DEA must have had some conversation regarding her interview

because he specifically asked her a question the DEA wanted to know. (A tape of her interview will be played during the next evidentiary hearing.)

v. DEA gave Corporal Watkins the name of Kristi Roberts's attorney.

*Kastigar Hearing Transcript (Testimony of Watkins) pg41, Lines 13-14, O.R.#326*

vi. Obtained DEA notes in reference to this case.

[Kevin Adams questioning Tulsa Police Department Detective Watkins]
```
Q: And I want to talk, I don't think its entirely
   clear, you said that you know you did see some DEA
   reports?

A: Well, I'm not sure.  I didn't see the reports.  It
   wasn't DEA reports.  It was just some notes that
   they had made and I don't –

Q: Okay.  In reference to this case?

A: Yes.

Q: Okay. And they, who is they?

A: Came from the DEA.  Like I said, I forwarded those
   over and I can look through mine to see if I made a
   copy of it, because I was – to be honest with you I
   was a little miffed that this wasn't being worked –
   I mean, I thought it was kidnapping across state
   lines and abuse and all that stuff, …
```

*Kastigar Hearing Transcript (Testimony of Watkins) pg48, Line 23-pg 51, line1, O.R.#326*

vii. Spoke with DEA Agent Kidwell, DEA Agent Weaver's partner, but does not know who he talked with first.

*Kastigar Hearing Transcript (Testimony of Watkins) pg52, Line 15-pg 54, Line 19, O.R.#326*

viii.     Spoke with DEA agents at the Federal Courthouse.

*Kastigar Hearing Transcript (Testimony of Watkins) pg55, Line 15- pg 56, L19, O.R.#326*

ix. Unsure whether he had been to their office on this case.

*Kastigar Hearing Transcript (Testimony of Watkins) pg55, Lines 19-25, O.R.#326*

x.  Met with DEA Agent Kidwell at the station and believes that is when he got the DEA notes.

*Kastigar Hearing Transcript (Testimony of Watkins) pg56, Lines 4-6, O.R.#326*

xi.  However, Watkins cannot tell us which agent gave him the DEA notes, he cannot remember.

"I can't tell you positively which one gave me the notes or how I came upon them."

*Kastigar Hearing Transcript (Testimony of Watkins) pg56, Lines 17-20, O.R.#326-#327*

**g.  Corporal Watkins Also Obtained Information about this case from AUSA Allen Litchfield.** *Substantial proof of a major immunity violation between the federal government and the state government.*

[Kevin Adams questioning Tulsa Police Department Detective Watkins]
Q: And what about any assistant U.S. Attorneys, did you speak to anybody at the U.S. Attorney's Office regarding this case?

A: Yes.

Q: Who did you speak with?

A: Mr. Litchfield.

*Kastigar Hearing Transcript (Testimony of Watkins) pg56, Lines 20-25, O.R.#327*

[Kevin Adams questioning Tulsa Police Department Detective Watkins]
Q: (By Mr. Robertson) And you learned from Alan Litchfield at some point, who is an assistant U.S. Attorney, that there would be no federal charges filed?

A: That was secondary. **I was first told by --- what happened, I was first told by them**, that's when I first started working on it.   (Emphasis added.)

*Kastigar Hearing Transcript (Testimony of Watkins) pg62, Lines 15-20, O.R.#327*

AUSA Allen Litchfield directly participated in the DEA investigation.  **The above testimony is adequate  proof on its own to claim an immunity violation and overturn the entire conviction**. And recall, Litchfield was present with Kidwell at the interview and

28

debriefing of Betty Stetler ( *See,* O.R. #225 (DEA 6 form) Synopsis, field 9).  Additionally

AUSA Litchfield was in communication with Assistant District Attorney ("ADA") Robertson

regarding this case. *See, Kastigar Hearing Transcript (Testimony of Watkins) pg6, Lines 16-25).*

Litchfield also spoke directly with DEA Karl Nichols who was the case agent for the case that

Mr. Skinner provided immunized testimony for.  This is clear from the email between AUSA

Greg Hough, who handled the *Pickard* trial that Mr. Skinner was given immunity for and AUSA

Allen Litchfield, from the Northern District of Oklahoma.

> ```
> The lead DEA agents were Karl Nichols, Oakland,
> California, and Roger Hanzlik, Kansas City.  Either,
> or both, can shed additional light on the matter.  If
> you've got Agents talking to Skinner, they should
> definitely coordinate with Nichols and Hanzlick.
>
> Gregory G. Hough
> O.C.D.E.T.F., Lead AUSA
> District of Kansas
> ```

> *Emails (See O.R. #232 (Bates 384, July 16, 2003), #233 (Bates 385, July 10, 2003), #234*
> *(Bates 386, July 9, 2003))*

In other emails, Alan Litchfield requests and is given Mr. Nichols's phone numbers and

then begins corresponding with Mr. Nichols.

> *Emails (See O.R. #349 (Bates 385, July 16, 2003), #233 (Bates 385, July 10, 2003*

### h.  Corporal Watkins and AUSA Alan Litchfield and ADA  David Robertson had known each other for many years prior to this case.

> ```
> In the late 1980's and early 1990's Alan Litchfield
> was an assistant district attorney (ADA) in Tulsa and
> worked with ADA Robertson and Watkins when Watkins
> worked in the Tulsa P.D. Narcotics office.
> ```
> *Writ of Cert., p.11, Lines 20-23*

### i.  Corporal Watkins Cannot Say What Information He Got From the DEA

In response to a cross-examination question asking Corporal Watkins whether DEA relayed information to him concerning what witnesses might say the Corporal gave this response:

> [Kevin Adams questioning Tulsa Police Department Detective Watkins]
> ```
> A: …So, whether  the DEA tells me something or the
>    father tells me something, it's hard to say which
>    one - where we got more information from.
>
> Q: But you had information from both the DEA and Mr.
>    Green's father?
>
> A: Correct.
> ```

*Kastigar Hearing Transcript (Testimony of Watkins) pg35, Lines 15-21, O.R.#328*

## OTHER EVIDENCE OF TAINT

1. **Detective Watkins asked William Hauck to obtain witness contact information from the DEA concerning Bill Wynn, a potential witness involving the allegations of this case.**

> [Tulsa Police Department Detective Watkins questioning William Hauck]
> ```
> A: I left, uh, in Bill Wynn's car to go see my
>    daughter and my girlfriend, and returned about noon
>    on the 5th.
>
> Q: O.K. How old is Bill Wynn?
>
> A: Uh, he's 35 to 40 years old.
>
> Q: O.K. Do you know where he lives?
>
> A: I don't have his address and phone number on me,
>    but that's… that's available through other agents
>    I've been talking to (inaudible).
>
> Q: But if I… If I want to get it, you could get it for
>    me?
>
> A: Yes.
> ```

Q: O.K. Go ahead.

*Statement of William Hauck, pp. 5-6, O.R.# 356-#357.*

2. **William Hauck was Working Closely with the DEA and Passing Information from the DEA Investigation to Corporal Watkins**

During Corporal Watkins's interview with William Hauck, Hauck admits that he

is working closely with the DEA.  He refers to DEA Agents Rick Weaver and Doug

Kidwell by their first names and has knowledge of DEA's investigation of Mr. Skinner

and passes that information onto Corporal Watkins.

> [Tulsa Police Department Detective Watkins questioning William Hauck]
> A: I'm… I'm terrified right now.  Hey, I… if… if I was
>    not working in such close conjunction with Rick and
>    Doug at the DEA, and if I wasn't here talking with
>    you, and I was just driving my truck, I guarantee
>    you I would have a… a…  a piece within reach.
>    (William Hauck is a convicted felon.  His possession
>    of a firearm would be a state and federal offense.)
> *See O.R. #329*

William Hauck is also aware that the DEA has interviewed Kristi Roberts or

"Kris" as he calls her, and he passes that information along to Corporal Watkins along

with his opinion that Corporal Watkins could obtain her contact information through the

DEA, *which is exactly what Corporal Watkins does.*

> [Tulsa Police Department Detective Watkins questioning William Hauck]
> A: … Her name was, uh, Kris.  I don't know her last
>    name.
>
> Q: O.K.
>
> A: Uh, but again, her name and address and all that
>    stuff, the… she's spoken to the… the other agency.
>
> Q: O.K.  And you're talking about the DEA when you say
>    other agency?
>
> A: Yes.

*See O.R. #329-#330.*

During his interview with Corporal Watkins, William Hauck gives Detective

Watkins information concerning Michael Chasteen that he obtained during his

cooperation with the DEA.

> [Tulsa Police Department Detective Watkins questioning William Hauck]
> Q: O.K.  Have you had any conversation with Crystal
>    since ten?
>
> A: Uh, just with Todd.  Uh, the … I met them in Broken
>    Arrow at Michael Shawn's house on two occasions.
>
> Q: What's his name?
>
> A: Michael Shawn Chasteen
>
> *See O.R. #330 referencing O.R.# 359*

However, William Hauck only found out Michael Shawn's last name after

meeting with Skinner for the DEA.

> "… The SOI also stated that he/she discovered that
>    Michael Shawn's last name is Chasteen."
>
> *See O.R. #330 referencing O.R.# 362, item #7*

After all of the above and before **any** investigation (other than no. 17) by Tulsa

Police – DEA turns over background reports of all concerned (O.R. #334, Point #3) and

DEA has Hauck contact Det. Watkins.  DEA gives handwritten notes to Watkins. Please

refer to *Kastigar* motion filed August 4, 2005, pgs. 12-20, O.R. #323-#331, and O.R.

#334-#337, pgs. 23-26. In mid September 2003, Tulsa County D.A.'s Office files

complaint on Skinner.

In mid September, 2003, Tulsa County D.A.'s Office files complaint on

petitioner.

## GROUND TWO

## THE INVESTIGATION, PROSECUTION, AND CONVICTION OF PETITIONER VIOLATED FEDERAL LAW TITLE 18 U.S.C.§ 6002

### LEGAL RIGHTS AND PRIVILEGES OF WHICH PETITIONER WAS DEPRIVED:

Petitioner was denied due process of law guaranteed by the Fifth Amendment to the U.S. Constitution, the United States Code, Title 18 § 6002, and the Oklahoma Constitution in Article II §§ 7, 20.

### RELEVANT CITATIONS:

*Kastigar v. U.S.,* 406 U.S. 441 (1972); *Marchetti v. U.S.,* 390 U.S. 39 (1968); *U.S. v. Hubbell*, 530 U.S. 27 (2000); *Murphy v. Waterfront Commission*, 378 U.S. 52 (1964); *Garrity v, New Jersey*, 385 U.S. 493; *Brown v. Walker*, 161 U.S. 591; *U.S. v. Gallo*, 859 F2d 1078 (2nd Cir. 1988); *U.S. v. Harvey*, 869 F2d 1439 (11th Cir. 1989), *United States v. Brown*, 763 F. Supp. 1518 (D. Ariz. 1991).

### FACTS OF THE CASE / ERRORS MADE BY:

Facts set forth in the foregoing claim support this claim. O.C.C.A. did not even rule on this ground; hence, ***de novo* review is required**. Consider the following excerpt from Title 18 § 6002(3):

> ...the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information **directly or indirectly derived** from such testimony or other information) may be used against the witness **in any criminal case**, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order. (Emphasis added.)

All of the State's evidence can be traced back to the derivative use of Petitioner's immunized statements: to his disclosure regarding Krystle Cole and his introduction of Cole to DEA agents.  State courts have failed to hold the government to this burden as well as the requirements of Elkins, where as in the instant case agents of the federal government sought to circumvent restrictions the law placed on themselves by handing information, in this case protected by an immunity agreement, to state officers.

*See also, Appellant Brief of Gordon Todd Skinner, particularly pp.17-20, OCCA Case # F-2007-1101.*

## RELEVANT CITATIONS:

*Kastigar V. U.S.,* 406 U.S. 441 (1972); *Marchetti v. U.S.,* 390 U.S. 39 (1968); *U.S. v. Hubbell,* 530 U.S. 27 (2000); *Murphy v. Waterfront Commission,* 378 U.S. 52 (1964); *Garrity v, New Jersey,* 385 U.S. 493; *Brown v. Walker,* 161 U.S. 591; *U.S. v. Gallo,* 859 F2d 1078 (2nd Cir. 1988); *U.S. v. Harvey,* 869 F2d 1439 (11th Cir. 1989)

## PROOF OF ABOVE STATED FACTS:

1. Petitioner was granted immunity in October 2000.

   *See contract between Skinner, Haney and Roth, O.R. #92-#93*

2. At DEA Agent Nichols' request, Skinner brings in Krystle Cole.
   a. *Kastigar* Transcript, June 12, 2006, Krystle Cole, p. 9, L23-p.10, L2; p.10, L15-20.

   > [Thomas Mortensen questioning Krystle Cole]
   > Q: Okay.  How did you hear the name Karl Nichols?  How did you first
   >    Come about to know he existed?
   >
   > A: From Todd.
   >
   > Q: All right.  And when did you hear that name Karl
   >    Nichols?

```
A: Before I had gone in to meet with him…

Q: And these meetings were set up and you heard of
   these agents through Todd Skinner?

A: Yes.

Q: Had it not been for Todd Skinner, do you think you
   would have met with these agents?

A: Probably not.
```

Obviously Cole and Nichols only became aware of each other through Todd Skinner, and only after he was granted immunity by the government.

b. *Kastigar* Transcript, August 8 – August 9, 2005, Gordon Todd Skinner, pages 8-16,

   particularly p.9, L3-7 and p.10, L11-22:

```
[Kevin Adams questioning Gordon Todd Skinner]
Q: Okay. Now, specifically, I'd like to talk about
   Karl Nichols.

A: Well, I should say that when I get to the meeting
   before I ever even gave my name, I also pled the
   Fifth, so that kicked in the Kastigar even further,
   so…

Q: And the question was did there come a time when you
   introduced Ms. Skinner to the DEA?

A: I was - - they were worried about a speedy trial by
   the defendants.  They asked me to bring in any and
   all witnesses that I could to help with their case.
   And I started bringing in, physically, witnesses,
   and I brought Krystle Cole in the month of January,
   2001.
```

3. In 2001 DEA Agent Langen offered Krystle Cole a deal to work against Skinner in the

   future.

   a. *Kastigar* Transcript, June 6, 2006, page 12, lines 12-22, Krystle Cole (Cross):

   [Thomas Mortensen questioning Krystle Cole]

Q: And any of these DEA agents that I just named,
   described, we talked about, did any of them ever ask
   you if you wanted to work against Todd Skinner?

A: Yes.

Q: What agent told that to you, and approximately what
   time frame are we talking about?

A: Eric and Andy during – during the investigation
   whenever I was interviewed about – about the Overton
   case the first time with them they mentioned it and
   then later whenever I had to talk with them again
   about the Tanasis case specifically when they came
   to Tucson they mentioned it again.

b.  *Kastigar* Transcript, August 8 – August 9, 2005, page 12, lines 10-25; pg. 13, lines

24-25; pg. 14, lines 1-25:

[Kevin Adams questioning Gordon Todd Skinner]
Q: Did there come a time when you learned that they
   had approached her about cooperating against you,
   and can you tell us about that.

A: Yes.  It was February of 2001, and it was a
   continual statement coming back to me from every
   witness, every witness said, every single DEA agent
   that meets with us is trying to find out dirt on you
   and wants us to cooperate with [them against] you.
   I made a formal complaint with the Department of
   Justice in Washington D.C. and they  - - that
   behavior stopped…

Q: Can you tell us, specifically, who requested her to
   cooperate against you?

A: Andy Langen.

Q: Okay. Now, did you ever testify in relation to the
   immunity agreement that you received back in October
   of 2000?

A: Yes, I did, in the year 2003.

Q: And which case did you happen to testify in?

A: It was headed as a William Leonerd Pickard - -
   United States versus Willaim Leonard Pickard and
   Clyde Apperson, with their aliases there…

Q: Okay.  And which DEA agents were present when you
   testified?

A: …they were Karl Nichols and Roger Hanzlick.

Q: Okay.  And this is the same Karl Nichols that you
   referred to earlier?

A: Yes, sir…

Q: Was [Krystle Cole Skinner] exposed to your *Kastigar*
   testimony?

A: Yes…

4.  Cole contacted the DEA office in Kansas City to take the DEA up on its offer to bring

   Cole in as a Source of Information ("SOI") against Skinner in June of 2003.  *Kastigar*

   Hearing Transcript, June 12, 2006, p.15, L25- p.16, L23; and DEA Agent Hanzlik (K.C.

   Office) contacts Tulsa DEA Agent Kidwell to set up meetings on June 12, 2003.  *See*

   *Bates Stamped #331-#333; O.R. #204-206; DEA-6 form, points #1-#3:*

   [Thomas Mortensen questioning Krystle Cole]
   Q: Okay.  I'd like to fast forward a little bit and ask
      you if you know a Roger Hanzlick?

   A: Yes.

   Q:Okay.  Do you know a Doug Kidwell?

   A: Yes.

   Q: Who are these people?

   A: Roger Hanzlik is the DEA agent in Kansas City that –
      okay.  At first whenever I was trying to go to the DEA
      here, I – I didn't go to the DEA here first.  I went
      to Kansas because I wanted to call Eric and Andy

```
    because they had in the past said, do know, if you
    ever have anything on Todd, let us know if you are
    willing tou help us or whatever.  And so I called them
    because I figured they were who I should call , and so
    they said , well, we can't do this, it's out of our
    jurisdiction, but why don't you talk to Roger because
    Roger will be able to get you in touch with somebody
    down there or whatever.  So then they pretty much just
    passed the buck –

A: …They basically passed it off to Roger.  So then I
    talked to Roger, and Roger told me to go to Doug
    Kidwell here in Oklahoma, that it wasn't in the Kansas
    jurisdiction but that I could go in and he set up an
    appointment for me with Doug Kidwell.
                          ………

1. On 006/12/2003, S/A Roger Hanzlick, DEA Kansas City,
    contacted the DEA Tulsa Resident Office in reference
    to Krystal Ann Cole.  COLE had been involved in a case
    that DEA K.C. had worked on in the past.  COLE had
    contacted DEA K.C. in reference to providing them with
    information on Gordon Todd SKINNER.
                        ………
3. COLE contacted TFO Doug Kidwell on the same date and
    arrangements were made for her to come in for an
    interview.
```

This proves that the investigation that began in June, 2003 is a **related investigation to the investigation from 2000 from which Skinner's immunity arose**. Cole gave the names of Skinner, Green, Picard, Wynn, Hickman, and Bear, but NOT William Hauck or Betty Strater. This is because Cole did not know them, on June 12, 2003.  Proof that Cole did not give DEA information on Hauck: See *Kastigar* Transcript, June 12, 2006, pg. 47, lines 5-8, Krystle Cole (cross):

```
[Thomas Mortensen questioning Krystle Cole]
Q: Okay.  And this information that you collected for the
    DEA, did it involve William Hauck?

A: I never knew who William Hauck was until I came back
    from Vegas.
```

And the following proves that Stetler did not meet Skinner or Cole until June 21, 2003:

*See O.R. #226-#230 (DEA-6 form, Bates stamped #345-#349), particularly O.R. #226, point #5*

*and O.R #227, point #16* &lt;Note: Recall that Cole is introduced to DEA by Skinner in January

2001, **much earlier** than that date. See <u>no 2.b.</u>, above.&gt;:

> ```
> 5. Stetler related that her first meeting with SKINNER had
>    taken place at Chris Wright's house, located in the 5300
>    block of South Peoria area, on 06/21/2003…
> ```
>
> ```
> 16. On 06/27/2003 Stetler and Wright met SKINNER and
>     Krystal COLE…
> ```

Brandon Green is debriefed **after** Cole is debriefed. See O.R. #208, point #2:

> > ```
> > 2. GREEN had brought his girlfriend, Krystal Ann COLE
> >    to the TRO so that she could speak to agents in
> >    reference to Gordon Todd SKINNER.  While there,
> >    Green decided to also speak to agents.
> > ```

5. Other than a fabricated story about a lab (which would have been covered by immunity) Cole gave information (true/false) on events that occurred prior to Judicial Immunity Grant. *See O.R. # 204-#206*

6. DEA agents Doug Kidwell, Rick Weaver, and Special Agent Barnett met with Skinner on July 8, 2003, a date **after** the date(s) on which alleged acts constituting the elements of the conviction Petitioner is appealing occurred:

*Trial Transcript, testimony of William Hauck (Tr.716, L12-14 and Tr.721, L14-722, L2):*

> ```
> Q: All right.  Did Todd and Krystle ride down with
>    you?
> ```
>
> ```
> A: No, sir.  Todd claimed that he had a meeting with
>    the DEA the following day and that he –
> ```
>
> ```
> Q: Okay.
> ```
>
> ```
> A: -- ended up being down there about 12 hours after
>    me.
> ```
>
> ```
> ….·
> ```

Q: How long afterwards did anyone else show up?

A: Todd showed up about 2:00 in the afternoon.  I got
   there about 2:00 in the morning and Todd and Krystle
   showed up about 2:00 in the afternoon.

Q: I'm sorry.  Could we get a clarification on the day
   that is, 2:00 in the afternoon when?

Q: Do you remember which day?

A: It would have been Tuesday, I'm not sure of the
   numerical number.  It is the day that Todd had his –
   that he claimed he had a meeting with Doug Kidwell
   with the DEA in the morning.

Q: All right.  Now, Tuesday, July 8th, sound right?

A: Yes.  That would probably be the day.


*Emails (See O.R. #232 (Bates 384, July 16, 2003), #233 (Bates 385, July 10, 2003), #234*

*(Bates 386, July 9, 2003)):*


[To:] Allen [Litchfield],
If I can be of any help, please let me know.  Yes there
is an unsatisfactory deactivation report, though I have
to check with my CS coordinator to see what needs to be
done to release that to you.  I spoke with Doug Kidwell,
before Skinner came in, to give him the details of the
guy.  I'll bet you had a very interesting interview.
[From:] Karl [Nichols] (*See O.R. #232, Bates 384, July
16, 2003, 7:40 PM*)

[To:] Gregory G. Hough,
Skinner is up to his old tricks again in his hometown.
**We are looking at him as a target.**  He is trying to head
us off.  I'm certain that nobody will try to use him as a
CI.  Is it possible to get a copy of the memo?  Thanks
AJL [Litchfield]. (See O.R. #233, Bates 385, July 10,
2003, 9:58 AM) (Emphasis added.)

[To:] Allen [Litchfield],

Skinner was involved in an LSD deal.  He and his attorney
got DOJ to give him immunity for his testimony against
the 2 other leaders (Pickard & Apperson).  After his
testimony in the LSD trial in D.Kan., Skinner flipped
back into the arms of his co-conspirators.  This
precipitated a bunch of mini-trials during our trial
wherein Skinner, sponsored by Pickard & Apperson,
testified that the 3 DEA agents, a courtroom deputy and I
all conspired to affect his trial testimony.  Skinner
alleged that, in spite of our best efforts, he testified
truthfully.  However, it was a tremendous distraction,
likely caused OPR investigations of all concerned and, at
the very least, was a breach of his immunity agreement.
In short, Skinner's immunity agreement was limited to the
LSD matter; Skinner breached his immunity agreement and
it is no longer valid and binding on the USA; and **I know
3 DEA agents, a courtroom deputy and an AUSA that would
love to see him imprisoned and the key thrown away.**
Besides that, no government authority should ever trust
Skinner again!!!  In fact, I instructed DEA to have no
contact with Skinner after this incident.  Nichols did a
memo, I believe to all DEA, informing them about this
matter so that Skinner would never be used as a CI again.
The lead DEA agents were Karl Nichols, Oakland, CA, and
Roger Hanzlik, Kansas City.  Either, or both, can shed
additional light on the matter.  If you've got agents
talking to Skinner, they should definitely coordinate
with Nichols and Hanzlik.  [From:] Gregory G. Hough,
O.C.D.E.T.F.  Lead A.U.S.A., District of Kansas. (See
O.R. # 233, Bates 386, **July 10, 2003, 8:24 AM**) (Emphasis
added.)

[To:] Greg Hough,
Can you tell me what this guy [Skinner] was up to?  He
has popped up and walked into DEA claiming all types of
immunity, etc.  Frankly he sounds a little spooky.
[From:] AJL [Litchfield].  (See O.R. # 234, Bates 386,
July 09, 2003, 4:40 PM)

*Kastigar Transcript, August 8 – August 9, 2005, Gordon Todd Skinner, pg. 18, lines 1-*

*14:*

A: The appointment [for Skinner to meet with DEA in
   Tulsa] was made for Friday at 9:30 in the morning
   before the July 4th weekend, and the DEA called him
   [Skinner's attorney, Mr. H.I. Aston] back and

```
          cancelled and said it was a holiday, we can't do it.
          We're having a bunch of people out that day.  And my
          wife, without requesting or telling me about it,
          went ahead and unilaterally changed that date to, I
          believe, July the 7th, the first Tuesday after the
          meeting - I mean, after that July 4th weekend.
```

The date of the first Tuesday after July 4, 2003 is actually **July 8, 2003**, and that is the

date the meeting in Tulsa between Skinner and the DEA took place.  See *Kastigar* Transcript,

August 8 – August 9, 2005, Gordon Todd Skinner, pg. 22, lines 18-25 and pg. 23, lines 1-6.  A

tape was made of the DEA meeting with Skinner, but was never turned over to defense.

13. Later on July 8, 2003, DEA and Assistant United States Attorney ("AUSA") Litchfield

   met with Betty Stetler (Agents Kidwell and Barnett are present.) Stetler gave information

   on William Hauck.

   a.  *See O.R. #225-230 (Bates Stamped #344-349) , particularly Item #17*

      *(O.R.#228)*(Stetler IDs Hauck); *and Item #18-#20 (O.R.#228)* (Stetler gives

      additional information on Hauck); *and Item #4 (O.R. #230)*(Initial information noted

      on Hauck):

```
      17. On 06/28/2003 Stetler and Wright met SKINNER,
          COLE, and Bill LNU [Hauck] for lunch at the Fuji
          restaurant, located… Bill was introduced to them by
          SKINNER and they were told Bill was a C.I.A. agent.
          During the meal Bill showed Wright a gun.  After
          lunch Stetler and Wright went back to Wright's
          housewhere Stetler received a call on her cellular
          telephone from Bill wanting to meet with her...

      20. Bill then told her that he would like to kiss her
          but he could not because she was only seventeen (17)
          years old.  Bill also told her that he would like to
          take her to the Cayman Islands but that he could not
          do that because of her age.  Bill and Stetler then
```

```
returned to Wright's house where Bill got back in
the car with SKINNER and Cole and they left.

INDEXING
4. Bill, W/M 5'6", 200lbs., Light features, Short Gray
   Hair, Late 30's Early 40's, NFI. (O.R. 230)
```

b. Stetler gave information on AmeriSuites Hotel (O.R.#227)

c. AUSA Litchfield listened to the tape of Skinner and was present at the meeting with

   Stetler, which occurred later on the same day as their July 8th meeting with Skinner.

   *See O.R.# 225, field #9*

d. DEA Release of Information ("ROI") showing "Bill" at Fuji restaurant meeting was

   Source of Information ("SOI") Bill Hauck. (O.R.#249, Item # 8).

14. On July 10, 2003 (Bates Stamped #350-352), after meeting with Skinner on July 8, 2003,

   and meeting with Stetler on July 8, 2003, Mandy Ray? was interviewed by DEA Agents

   Kidwell and Barnett. Ray gives information on Kristi Roberts? See O.R. #221, point #2,

   point #5; O.R. #222, points #9-#10:

```
2. On 07/10/2003, TFO Doug Kidwell was contacted by
   Det. Wayne Stinett, Claremore Police Department, in
   reference to him having some drugs in his
   procession[sic] that had come from Gordon Todd
   SKINNER.

5. Ms. Ray stated that she and several of her friends
   play pool in a local bar tournament and that
   approximately three (3) weeks ago a friend of hers,
   Kristi ROBERTS, had come to the bar and had given
   her (Ray), and another friend, Dena (AKA Dino)
   Dobbs, some tannish/brown pills and some capsules
   with white powder in them.
   …

9. On the night that ROBERTS had given her the pills
   everyone was 'Tripped out' and that she, Ray, had
```

```
           acted that [way] as to as to not offend ROBERTS.
           ROBERTS had called SKINNER at his mother's house in
           Tulsa and that SKINNER had tried to talk her, Ray,
           into coming to the house.  Ray refused to go
           anywhere around SKINNER.

        10. Ray stated that she did not like SKINNER because
           of what he was doing to ROBERTS.  That ROBERTS was
           staying, sometimes with SKINNER at the Doubletree
           Hotel in Tulsa.  That while ROBERTS was seeing
           SKINNER that he had married Krystal Ann COLE and
           that SKINNER had wanted to continue his relationship
           with ROBERTS.  Ray further stated that every time
           [sic] she saw ROBERTS since her meeting with Skinner
           that she was always 'drugged up'.
```

Mandy Ray gave information on Skinner, Cole, Green, Roberts and the Tulsa Downtown

Doubletree, and this is the first proof in a government document showing DEA's link to Roberts.

See DEA-6 form showing DEA's indexing/accumulation of contacts on *O.R. #222-#223,*

*particularly Item #4*:

```
           "4. ROBERTS, Kristi Sue, W/F, brown Hair, Green Eyes,
           %'*", 100lbs.,..NADDIS: Negative".
```

15. On Friday, 7/11/2003, DEA Agents Kidwell, Weaver, Mieir, Adcock, and Barnett

   debriefed Kristi Roberts, Laura Ball, and Deno Dobbs at the Pryor Police Department.

   See O.R. #268-#271(Bates Stamped #355-#356).  It is important to note that this contact

   was initiated by DEA agents, who detained the woman, including Kristi Roberts, through

   a traffic stop. The woman didn't just walk into the Pryor Police Department on their own,

   and obviously the district court and prosecutor didn't want any record of this established.

   *See Tr. Vol. III, p.527, L21-25*:

```
        Q: Did you talk to the police about this case?
```

```
A: At that time, the DEA had pulled us over on
   Thursday -

The Court: Well -

Q: (By [prosecutor]) Let me stop you right there -
```

These interviews led to investigations of the Doubletree Hotel, Amy Ball, Laura Ball, Dena Dobbs, storage units by #s, the Ambassador Hotel, and **specifically** to Doubletree Hotel Room #1411 (the alleged kidnapping room). *See O.R. #270, Item #15*:

```
15. Laura Ball says that on one occasion her sister Amy
    Ball did attend one of Todd SKINNER'S parties at the
    Doubletree Hotel Room #1409 and she believes this was in
    late April or early May of 2003.  Amy Ball was given the
    "Official Sacrament" as she has heard it called numerous
    times by different people.  Ball says that her sister
    told her that Todd SKINNER offered her a wafer or cracker
    and was told it contained LSD which would allow her to
    get in touch with her true inner feelings.  Amy ball was
    then led into an adjacent room which was room number
    1411.
```

Kristi Roberts states she met Skinner through a friend. *See O.R. #272, Item #2.*

16. On 7/12/2003, Laura Ball contacts DEA Agent Weaver to set up a second meeting between Kristi Roberts and DEA. *See O.R. #272, Point #1*:

17. On 7/14/2003, Kristi Roberts meets with DEA Agents Weaver, Adcock, Mieir, Kidwell, and Barnett. This meeting is prior to the DEA interview with William Hauck. During this meeting DEA obtained information on alleged kidnapping of Brandon Green, storage units, phone numbers, Krystle Cole, Brandon Green, Gordon Todd and Hauck. Skinner. *See O.R. #272.*

18. Later, on 7/14/2003, at approximately 3:00 p.m., DEA Agents Weaver and Barnett and

FBI Special Agent Jeremy Sikes met with Mark Green. This meeting took place after

Green spoke with U.S. Attorney David O'Meilia, who informed Green that DEA was the

lead agency on this case. *See O.R. #245, Item #2 and 3*:

```
2. On Monday July 14, 2003, at approximately 3:00 p.m.,
   Mark Green, the father of Brandon GREEN, came to the
   Tulsa R/O to provide information on his son's condition
   to TFO Rick Weaver and FBI SA Jeremy Sikes.

3. Mark Green stated that he came by Tulsa Resident
   office to speak with Agents concerning Gordon Todd
   SKINNER.  Mark Green stated that he has talked with Mr.
   David O'Melia of the U.S. Attorney's office and the
   Tulsa Police Department concerning SKINNER and they
   informed him to speak with the DEA.
```

It is important to note that Mark Green in another document claimed he was in Texas on

this date. A second odd situation is TRACIS report, which said Mark Green called in a report to

Detective Watkins of the Tulsa Police Department on July 14, 2003 however both claim on the

witness stand that Mark Green came by the office in person. The TRACIS report is dubious at

best when inspected for proper IDs, dates and other information. Much later, information learned

by Det. Watkins appeared on the report dated 7/14/2003.

Det. Watkins misled/lied to United States Department of Justice ("U.S.D.O.J") employee

Dan McGraw (see PSI/PSR) as to the origin of the case, claiming the Doubletree Hotel contacted

him.  This claim is discredited by the testimony of Doubletree employees and Detective Watkins

himself, as well as by his sworn affidavit.

19. On July 14, 2003, William Hauck claimed he contacted the Tulsa DEA from Morgan

City, LA as to drug activity of Skinner – labs and such. Hauck had spoken to Kristi

Roberts and Skinner. Both people told Hauck of the DEA investigation and the arrest of Kristi Roberts, Laura Ball, and Dena Dobbs.  Hauck knew Roberts and Dobbs from July 5, 2003.  Hauck's cell phone records would prove calls to DEA and Roberts, and NONE to Skinner. Skinner requested phone records and Det. Watkins obtained Hauck's records. To this date, such records were never provided to Petitioner or his attorneys.

a.  First DEA interview with Hauck was July 16 of 2003.  Proof that Hauck knew Kristi Roberts had been interviewed by DEA.  See O.R.#329-#330; and O.R.# 358:

> ```
> A: ...she's [Kristi Roberts) spoken to the ... the .other
>    agency.
>
> Q: And you're talking about the DEA when you say other
>    agency?
>
> A: Yes.
> ```

b.  July 16, 2003, Tulsa DEA Agents Mieir and Adcock pick Hauck up at the Oklahoma City bus station and take him to the OKC DEA office, where FBI Agent Richard A. Colladi interviews Hauck – the alleged first debrief of William Hauck by **any** law enforcement as to alleged kidnapping of Green and into alleged activities of Skinner. *See O.R. #248-#257(Bates Stamped #362-#371), particularly #248, Item #2*:

> ```
> 2. On July 16, 2003 TFO Gayla Adcock and TFO Bob
>    Mieir, along with FBI S/A Richard A. Collodi of the
>    Oklahoma City FBI office interviewed William HAUCK
>    (hereafter referenced as Source of Information or
>    SOI) at the Oklahoma City DEA District Office.
> ```

Hauck provides information on Cole, Green, Skinner, Roberts, Wynn, Wright, and Stetler, Doubletree Hotel rooms 1409, 1411, and 1513, and on Premiere Inn

(Texas), room #116. Hauck gives information on Skinner's Porsche, Bill Wynn's address and phone numbers, and information Hauck had found on the internet as to Skinner and Boris Olarte. *See O.R. #256, item #37.*

20. On July 18, 2003, DEA Agents Weaver and Barnett, along with FBI Agent Sikes, interview Brandon Green. Green gives his version of the alleged kidnapping, but only after being filled in by Kristi Roberts. Green does not know Hauck's last name, phone number, or address. *See O.R.#264-#266:*

```
Q: Have you talked to Christy Roberts?

A: No.

Q: OK.  Did she tell you about the things that
   happened?

A: She gave me the entire story [of the alleged
   kidnapping], and her and I together went to the DEA,
   and we both gave our testimonies to the DEA.
   Unfortunately, it was not recorded.

Q: OK.  So Christy, you have talked to her, and she
   confirmed these things that you already know pretty
   much?

A: Yes, she filled in all the details.
```

Proof Brandon Green's testimony was obtained by DEA after Petitioner had been interviewed by DEA on July 8, 2003, but prior to Tulsa Police interviewing Brandon Green in mid August, 2003. (***TULSA POLICE INTERVIEW OF GREEN ATTACHED TO FIRST KASTIGAR MOTION*** August 16, 2003) (O.R. 264-266)  Tulsa Police interview of Brandon Green was conducted after DEA turned over handwritten notes, background reports and DEA met many times with Tulsa Police Detective Watkins. Detective Watkins waits more than 45 days after event to interview Brandon Green. The

48

claim by Detective Watkins that he was waiting for Brandon Green to get better is not valid as DEA and FBI had no problem interviewing Brandon Green in their[DEA] offices. DEA and FBI had interviewed Brandon Green twice in first ten days. (O.R.    ) This interview with Brandon Green by DEA and FBI occurred in the time period that DEA was running investigation of alleged kidnapping. (O.R. DEA 6 FORM with DEA statement about Mr. David O'Mielia) Detective Watkins admitted obtaining information directly from AUSA Litchfield about details of alleged. (*Kastigar* Hearing Transcript May 25, 2005, Testimony of Detective Watkins, page 62, lines 15-20, O.R. #327) Please read Brandon Green *Kastigar* Hearing on 16 June 2003, Volume IV, pages 827-852.

Brandon Green *Kastigar* Hearing on 16 June 2003, Volume IV, page 830, line 3-9:
```
Q. Do you remember the what information you gave
   them[DEA] during that period of  time ?

A. I tried giving them[DEA] as much information as
   possible to my kidnapping and the involvement with
   Todd.   (Emphasis added.)
```

21. On July 27, 2003, DEA Agents Adcock, Boyd, and Barnett meet with Hauck (*O.R. #218, Items #1 and #2*) and Hauck meets with Skinner (*points #3 and #4*). During this, DEA learned of M. Chasteen phone number address, and of Skinner's hotel:

```
On July 27, 2003, TFOs Gayla Adcock and Jolen Boyd met
with a Source of Information (hereafter referred to
as SOI) regarding a scheduled meeting with Gordon
Todd SKINNER and the SOI.
```

22. On July 31, 2003, Hauck meets with DEA Agents Kidwell, Weaver, and Barnett (*O.R. #258-262*). Hauck gives information of alleged events at Doubletree Hotel. DEA contacts Det. Watkins on July 31, 2003 and gives him information, which is obviously used by Watkins to obtain a warrant.

It is important to note that **on this very day** Watkins executes a search warrant on the Doubletree Hotel room.

23. On May 25, 2005, Corporal Gene Watkins testified during the *Kastigar* hearing in this matter. There were a number of facts established during that hearing. Some of those facts are highlighted below:

> **(1) The DEA Assisted Corporal Watkins in Contacting State's Witness William Hauck**
> During the hearing, Corporal Watkins testified to this.
> ```
> Q: ...you were able to get into contact with Mr. Hauck
>    through Rick Weaver's assistance?
>
> A: That's correct.
> ```
> *May 25, 2005 Kastigar hearing Transcript (Testimony of Watkins) pg. 40, Lines 20-22, O.R. #324*

In fact, without assistance from Mr. Weaver, Corporal Watkins was unaware of Mr. Hauck's

identity or existence.

> ```
> Q: So you were unaware of Mr. Hauck, even his identity
>    without the assistance of Mr. Weaver?
> A; At that time, no, I did not.
> ```
> *Kastigar Hearing Transcript (Testimony of Watkins) pg. 41, Lines 5-7, O.R.#324*

**b. The DEA Assisted Corporal Watkins in Looking for State's Witness Kristi Roberts**

> ```
> Q: Okay, but here's the issue, you contacted the DEA
>    and told them you were looking for Kristi Roberts,
>    and they assisted you in trying to find Kristi
>    Roberts?
>
> A: Correct.
> ```
> *Kastigar Hearing Transcript (Testimony of Watkins) pg. 41, Lines 22-25, O.R.#324*

**c. The DEA interviewed State's Witness William Hauck and Kristi Roberts concerning the allegations of this case Prior to Corporal Watkins interviewing those witnesses**

> ```
> Q: Now, isn't it your understanding that Mr. Hauck had
>    already discussed these events with the DEA prior to
>    your talking to him?
>
> A: Yes.
> ```

Q: Is it your understanding that Kristi Roberts had
   already discussed these events with the DEA prior to
   you talking to him?

A: I know that they had - yes.

*Kastigar Hearing Transcript (Testimony of Watkins) pg. 36, Lines 7-14, O.R.#324-325*

**d.   The DEA turned over notes from their investigation to Corporal Watkins**

Q: And I want to talk, I don't think it is entirely
   clear, you said that you know you did see some DEA
   reports?

A: Well, I'm not sure.  I didn't see reports.  It
   wasn't DEA reports, it was just some notes that they
   made and I don't -

Q: Okay?  And here's the question:  The notes they
   made was from what?  What were those notes in
   reference?

A: Reference to this case.

Q: Okay.  In reference to this case?

A: Yes.

Q: Okay. And they, who is they?

A: Came from the DEA,…

*Kastigar Hearing Transcript (Testimony of Watkins) pg. 36, Lines 7-14, O.R.#325*

**e.   In addition to the notes the DEA gave Detective Watkins, the DEA turned over a
       Report on Background Checks of the Witnesses**

Q: Corporal did you receive anything from the Drug
   Enforcement Agency?
A: Later they gave me a report on some of their
   background checks that they had done.

*Kastigar Hearing Transcript (Testimony of Watkins) pg. 28, Lines 16-19, O.R.#325-326*

**f.   That Corporal Watkins Had Numerous Contacts with the DEA Agents
       Concerning this Case.  Watkins:**

i.   Contacted DEA Agent Rick Weaver to see if DEA working the case.

A: … And I did contact an officer that works for DEA,
   but he's actually a Jenks officer, and I asked him
   if this was a case they were going to be working or

```
      a case that the City of Tulsa, that we were going to
      be working.
```
*Kastigar Hearing Transcript (Testimony of Watkins) pg. 13, Lines 1-5, O.R.#326*

ii. Talked with Rick Weaver to see if he could get a hold of truck driver.

```
      A: ... Well then I contacted  -- I did talk to Mr.
      Weaver, who's the Jenks policeman that was working
      on the DEA task force, and asked him, I said look, I
      said, do you know how I can get a hold of the truck
      driver, Bill?
```
*Kastigar Hearing Transcript (Testimony of Watkins) pg. 19, Line 20 - 24,*
*O.R.#326*

iii. Obtained DEA report on background checks.

```
      Q: Corporal, did you receive anything from the Drug
      Enforcement Agency?
      A: Later they gave me a report on some of their
      background checks they had done.
```
*Kastigar Hearing Transcript (Testimony of Watkins) pg. 28, Lines 16-19,*
*O.R.#326*

iv. DEA wanted information on Kristi Roberts. *Kastigar Hearing Transcript (Testimony of Watkins) pg37, Lines 13-22, O.R.#326* This establishes Corporal Watkins and DEA must have had some conversation regarding her interview because he specifically asked her a question the DEA wanted to know. (A tape of her interview will be played during the next evidentiary hearing.)

v. DEA gave Corporal Watkins the name of Kristi Roberts's attorney.

*Kastigar Hearing Transcript (Testimony of Watkins) pg41, Lines 13-14, O.R.#326*

vi. Obtained DEA notes in reference to this case.

```
      Q: And I want to talk, I don't think its entirely
      clear, you said that you know you did see some DEA
      reports?

      A: Well, I'm not sure.  I didn't see the reports.  It
      wasn't DEA reports.  It was just some notes that
      they had made and I don't -

      Q: Okay.  In reference to this case?

      A: Yes.

      Q: Okay. And they, who is they?

      A: Came from the DEA.  Like I said, I forwarded those
      over and I can look through mine to see if I made a
```

```
      copy of it, because I was - to be honest with you I
      was a little miffed that this wasn't being worked -
      I mean, I thought it was kidnapping across state
      lines and abuse and all that stuff, …
```
*Kastigar Hearing Transcript (Testimony of Watkins) pg48, Line 23-pg 51, line1, O.R.#326*

vii. Spoke with DEA Agent Kidwell, DEA Agent Weaver's partner, but does not know who he talked with first.

*Kastigar Hearing Transcript (Testimony of Watkins) pg52, Line 15-pg 54, Line 19, O.R.#326*

viii.      Spoke with DEA agents at the Federal Courthouse.

*Kastigar Hearing Transcript (Testimony of Watkins) pg55, Line 15- pg 56, L19, O.R.#326*

ix. Unsure whether he had been to their office on this case.

*Kastigar Hearing Transcript (Testimony of Watkins) pg55, Lines 19-25, O.R.#326*

x. Met with DEA Agent Kidwell at the station and believes that is when he got the DEA notes.

*Kastigar Hearing Transcript (Testimony of Watkins) pg56, Lines 4-6, O.R.#326*

xi. However, Watkins cannot tell us which agent gave him the DEA notes, he cannot remember.

```
      "I can't tell you positively which one gave me the
        notes or how I came upon them."
```
*Kastigar Hearing Transcript (Testimony of Watkins) pg56, Lines 17-20, O.R.#326-#327*

**g. Corporal Watkins Also Obtained Information about this case from AUSA Allen Litchfield. *Substantial proof of a major immunity violation between the federal government and the state government.***

```
      Q: And what about any assistant U.S. Attorneys, did
        you speak to anybody at the U.S. Attorney's Office
        regarding this case?

      A: Yes.

      Q: Who did you speak with?

      A: Mr. Litchfield.
```
*Kastigar Hearing Transcript (Testimony of Watkins) pg56, Lines 20-25, O.R.#327*

```
Q: (By Mr. Robertson) And you learned from Alan
   Litchfield at some point, who is an assistant U.S.
   Attorney, that there would be no federal charges
   filed?
A: That was secondary.  I was first told by --- what
   happened, I was first told by them, that's when I
   first started working on it.  (Emphasis added.)
```
*Kastigar Hearing Transcript (Testimony of Watkins) pg62, Lines 15-20, O.R.#327*

AUSA Allen Litchfield directly participated in the DEA investigation.  And recall,

Litchfield was present with Kidwell at the interview and debriefing of Betty Stetler ( *See,* O.R.

#225 (DEA 6 form) Synopsis, field 9).  Additionally AUSA Litchfield was in communication

with Assistant District Attorney ("ADA") Robertson regarding this case. *See, Kastigar Hearing*

*Transcript (Testimony of Watkins) pg6, Lines 16-25).*  Litchfield also spoke directly with DEA

Karl Nichols who was the case agent for the case that Mr. Skinner provided immunized

testimony for.  This is clear from the email between AUSA Greg Hough, who handled the

*Pickard* trial that Mr. Skinner was given immunity for and AUSA Allen Litchfield, from the

Northern District of Oklahoma.

```
The lead DEA agents were Karl Nichols, Oakland,
California, and Roger Hanzlik, Kansas City.  Either,
or both, can shed additional light on the matter.  If
you've got Agents talking to Skinner, they should
definitely coordinate with Nichols and Hanzlick.

Gregory G. Hough
O.C.D.E.T.F., Lead AUSA
District of Kansas
```

*Emails (See O.R. #232 (Bates 384, July 16, 2003), #233 (Bates 385, July 10, 2003), #234*
*(Bates 386, July 9, 2003))*

In other emails, Alan Litchfield requests and is given Mr. Nichols's phone numbers and

then begins corresponding with Mr. Nichols.

*Emails (See O.R. #349 (Bates 385, July 16, 2003), #233 (Bates 385, July 10, 2003*

### h.  Corporal Watkins and AUSA Alan Litchfield and ADA  David Robertson had known each other for many years prior to this case.

```
In the late 1980's and early 1990's Alan Litchfield
was an assistant district attorney (ADA) in Tulsa and
worked with ADA Robertson and Watkins when Watkins
worked in the Tulsa P.D. Narcotics office.
```
*Writ of Cert., p.11, Lines 20-23*

### i.  Corporal Watkins Cannot Say What Information He Got From the DEA

In response to a cross-examination question asking Corporal Watkins whether

DEA relayed information to him concerning what witnesses might say the Corporal gave

this response:

```
A: …So, whether  the DEA tells me something or the
   father tells me something, it's hard to say which
   one – where we got more information from.

Q: But you had information from both the DEA and Mr.
   Green's father?

A: Correct.
```
*Kastigar Hearing Transcript (Testimony of Watkins) pg35, Lines 15-21, O.R.#328*

### OTHER EVIDENCE OF TAINT

### 3.  Detective Watkins asked William Hauck to obtain witness contact information from the DEA concerning Bill Wynn, a potential witness involving the allegations of this case.

```
A: I left, uh, in Bill Wynn's car to go see my
   daughter and my girlfriend, and returned about noon
   on the 5th.

Q: O.K. How old is Bill Wynn?

A: Uh, he's 35 to 40 years old.
```

```
Q: O.K. Do you know where he lives?

A: I don't have his address and phone number on me,
   but that's… that's available through other agents
   I've been talking to (inaudible).

Q: But if I… If I want to get it, you could get it for
   me?

A: Yes.

Q: O.K. Go ahead.
```
*Statement of William Hauck, pp. 5-6, O.R.# 356-#357.*

**4.  William Hauck was Working Closely with the DEA and Passing Information from the DEA Investigation to Corporal Watkins**

During Corporal Watkins's interview with William Hauck, Hauck admits that he

is working closely with the DEA.  He refers to DEA Agents Rick Weaver and Doug

Kidwell by their first names and has knowledge of DEA's investigation of Mr. Skinner

and passes that information onto Corporal Watkins.

```
A: I'm… I'm terrified right now.  Hey, I… if… if I was
   not working in such close conjunction with Rick and
   Doug at the DEA, and if I wasn't here talking with
   you, and I was just driving my truck, I guarantee
   you I would have a… a…  a piece within reach.
   (William Hauck is a convicted felon.  His possession
   of a firearm would be a state and federal offense.)
```
*See O.R. #329*

William Hauck is also aware that the DEA has interviewed Kristi Roberts or

"Kris" as he calls her, and he passes that information along to Corporal Watkins along

with his opinion that Corporal Watkins could obtain her contact information through the

DEA, *which is exactly what Corporal Watkins does.*

```
A: … Her name was, uh, Kris.  I don't know her last
   name.

Q: O.K.
```

```
A: Uh, but again, her name and address and all that
   stuff, the… she's spoken to the… the other agency.

Q: O.K.  And you're talking about the DEA when you say
   other agency?

A: Yes.
```
*See O.R. #329-#330.*

During his interview with Corporal Watkins, William Hauck gives Detective

Watkins information concerning Michael Chasteen that he obtained during his

cooperation with the DEA.

```
Q: O.K.  Have you had any conversation with Crystal
   since ten?

A: Uh, just with Todd.  Uh, the … I met them in Broken
   Arrow at Michael Shawn's house on two occasions.

Q: What's his name?

A: Michael Shawn Chasteen
```
*See O.R. #330 referencing O.R.# 359*

However, William Hauck only found out Michael Shawn's last name after

meeting with Skinner for the DEA.

```
"… The SOI also stated that he/she discovered that
   Michael Shawn's last name is Chasteen."
```
*See O.R. #330 referencing O.R.# 362, item #7*

After all of the above and before **any** investigation (other than no. 17) by

Tulsa Police – DEA turns over background reports of all concerned (O.R. #334,

Point #3) and DEA has Hauck contact Det. Watkins.  DEA gives handwritten

notes to Watkins. Please refer to *Kastigar* motion filed August 4, 2005, pgs. 12-

20, O.R. #323-#331, and O.R. #334-#337, pgs. 23-26. In mid September 2003,

Tulsa County D.A.'s Office files complaint on Skinner.

In mid September 2003, Tulsa County D.A.'s Office files complaint on petitioner.

## GROUND THREE:

### PETITIONER'S IMMUNITY CONTRACT IS BINDING ON THE STATE OF OKLAHOMA AND THE FEDERAL GOVERNMENT, AND HIS PROSECUTION IN THE INSTANT CASE VIOLATED THAT AGREEMENT.

### LEGAL RIGHTS AND PRIVILEGES OF WHICH PETITIONER WAS DEPRIVED:

Petitioner was denied due process of law guaranteed by the Fifth Amendment to the U.S.

Constitution, and the Oklahoma Constitution in Article II §§ 7, 20.

### RELEVANT CITATIONS:

*Kastigar v. U.S.,* 406 U.S. 441 (1972); *Marchetti v. U.S.,* 390 U.S. 39 (1968); *U.S. v. Hubbell*, 530 U.S. 27 (2000); *Murphy v. Waterfront Commission*, 378 U.S. 52 (1964); *Garrity v, New Jersey*, 385 U.S. 493; *Brown v. Walker*, 161 U.S. 591; *U.S. v. Gallo*, 859 F2d 1078 (2nd Cir. 1988); *U.S. v. Harvey*, 869 F2d 1439 (11th Cir. 1989), *United States v. Brown*, 763 F. Supp. 1518 (D. Ariz. 1991).

### PROOF OF ABOVE STATED FACTS:

The facts supporting this claim are set forth above in Ground Two, pp. 33-57. They are identical claims but different legal theory. What distinguishes this Ground from other like claims is that the United States government used the State of Oklahoma as a "front man", therefore, separate sovereign theory should not apply.

### FACTS OF THE CASE / ERRORS MADE BY:

Facts set forth in the foregoing claims support this claim. Additionally, consider the pertinent part of the actual contract signed by Petitioner:

> (2) In exchange for your agreement to cooperate with the undersigned and/or other federal agents, the United States Department of Justice, Narcotic and Dangerous Drug Section agrees that **no statement or other information (including documents) given by you <u>during this and subsequent meetings</u> will be used directly or indirectly against you in <u>any</u> criminal case**, as those terms are understood in 18 U.S.C. § 6002, subject to the provisions of this letter. (emphasis added)

*Immunity Contract, Item # 2, O.R.#92-#93; See also, O.R.#94-#96.*

There is no doubt that such a "subsequent meeting" occurred after the alleged acts which are the elements of the conviction from which Petitioner now seeks relief, and even after the alleged victim, Mr. Green, and the SOI, Mr. Hauck, had already left the State of Oklahoma. *See also, Appellant Brief of Gordon Todd Skinner, particularly pp.20-26, OCCA Case # F-2007-1101.*

<div align="center">

### PROOF OF ABOVE STATED FACTS:

</div>

The following chronology traces the history of the investigation, making clear the numerous instances of violations of Petitioner's rights under *Kastigar*:

1. Skinner granted immunity in October 2000

2. At DEA Agent Nichols' request, Skinner brings in Krystle Cole.

    a. *Kastigar* Transcript, June 12, 2006, Krystle Cole, pages 8-14

    b. *Kastigar* Transcript, August 8 – August 9, 2005, Gordon Todd Skinner, pages 8-16

3. DEA Agent Langen offers Krystle Cole a deal to work in future against Skinner in 2001

    a. *Kastigar* Transcript, June 12, 2006, page 12, lines 12-22, Krystle Cole (Cross)

    b. *Kastigar* Transcript, August 8 – August 9, 2005, page 12, lines 10-25; pg. 13, lines 24-25; pg. 14, lines 1-25

4. Cole contacts DEA office in Kansas City to take DEA up on its offer in June of 2003.

   a. *Kastigar* Hearing Transcript, June 12, 2006, pg. 16, lines 6-23

5. DEA Agent Hanzlick (K.C. Office) contacts Tulsa DEA Agent Kidwell to set up meetings on June 12, 2003.

   a. Bates Stamped #331-#333

   b. O.R. #204-206

   c. DEA-6 form, points #1-#3

This proves investigation is related investigation. Cole gives names of Skinner, Green, Picard, Wynn, Hickman, and Bear, but NOT William Hauck or Betty Strater because Cole did not know them on June 12, 2003.

Proof that Cole did not give DEA information on Hauck:

   a. *Kastigar* Transcript, June 12, 2006, pg. 47, lines 5-8, Krystle Cole (Cross)

   b. DEA-6 form

   c. Bates stamped #345-#349

   d. O.R. #226-#230

Above proves Stetler did not meet Skinner or Cole until June 21, 2003 (O.R. #226, point #5) <Note: Cole meets DEA before that date.>

Brandon Green Is debriefed AFTER Cole is debriefed.

   a. O.R. #208, point #2

6. Other than a fabricated story about a lab (which would have been covered by immunity) Cole gives information (true/false) on events that occurred prior to Judicial Immunity Grant.

7. DEA meets with Skinner on July 8, 2003

    a. Trial Transcript, testimony of William Hauck

    b. Emails

    c. Bates Stamped #384-#386

    d. O.R. #232-#234

    e. *Kastigar* Transcript, August 8 – August 9, 2005, Gordon Todd Skinner, pg. 18, lines 1-14

The date of the first Tuesday after July 4, 2003 is July 8, 2003

    a. *Kastigar* Transcript, August 8 – August 9, 2005, Gordon Todd Skinner, pg. 22, lines 18-25 and pg. 23, lines 1-6

A tape was made of the DEA meeting with Skinner, but was never turned over to defense.

8. Later on July 8, 2003, DEA and AUSA Litchfield meet with Betty Stetler (Agents Kidwell and Barnett are present.) Stetler gives information on William Hauck.

    a. Bates Stamped #344-349

    b. O.R. #228 – Stetler IDs Hauck (Item #7) and further gives information on Hauck (#18-20)

Stetler gives information on AmeriSuites Hotel.

AUSA Litchfield listens to tape of Skinner.

9. On July 10, 2003 (Bates Stamped #350-352), after meeting with Skinner on July 8, 2003 and meeting with Stetler on July 8, 2003, Mandy Ray was interviewed by DEA Agents Kidwell and Barnett. Ray gives information on Kristi Roberts.

    a. O.R. #221, point #2, point #5

    b. O.R. #222

    c. Bates Stamped #351, points #9-#10

Mandy Ray gives information on Skinner, Cole, Green, and Roberts and Tulsa Downtown Doubletree.

10. On Friday, 7/11/2003, DEA Agents Kidwell, Weaver, Mieir, Adcock, and Barnett debrief Kristi Roberts, Laura Ball, and Deno Dobbs at Pryor Police Department.

    a. O.R. #268-#271

    b. Bates Stamped #355-#356

These interviews led to Doubletree, Amy Ball, Laura Ball, Dena Dobbs, storage units by numbers, Ambassador Hotel, AND SPECIFICALLY to Doubletree Hotel Room #1411 (the alleged kidnapping room).

    a. O.R. #270, Item #15

11. On 7/12/2003, Laura Ball contacts DEA Agent Weaver to setup a second meeting between Kristi Roberts and DEA.

    a. O.R. #272, Point #1

12. On 7/14/2003, Kristi Roberts meets with DEA Agents Weaver, Adcock, Mieir, Kidwell, and Barnett. This meeting is prior to the DEA interview with William Hauck. During this meeting DEA obtained information on alleged kidnapping of Brandon Green, storage units, phone numbers, Krystle Cole, Brandon Green, and Gordon Todd Skinner.

    a.  O.R. #272

13. Later on 7/14/2003, at approximately 3:00 p.m., DEA Agents Weaver and Barnett and

    FBI Special Agent Jeremy Sikes met with Mark Green. This meeting took place after

    Green spoke with U.S. Attorney David O'Meilia, who informed Green that DEA was the

    lead agency on this case.

    a.  O.R. #245, Point #2

    b.  O.R. #245, Item #3

Note: M. Green, in another document, claims he was in Texas on this date. A second odd

situation is TRACIS report, which says M. Green called in report to Detective Watkins of

the Tulsa Police Department on July 14, 2003, but both claim on the witness stand that

M. Green came by the office in person. The TRACIS report is dubious at best when

inspected for proper IDs, dates, and other information. Information learned by Det.

Watkins much later ends hp on report dated 7/14/2003.

Det. Watkins misled/lied to U.S.D.O.J. employee Dan McGraw (see PSI/PSR) as to the

origin of the case, claiming the Doubletree Hotel contacted him. This is discredited by

testimony of Doubletree employees and Det. Watkins himself, as well as by his sworn

affidavit.

14. On July 14, 2003, William Hauck claims he contacted the Tulsa DEA from Morgan City,

    LA as to drug activity of Skinner – labs and such. Hauck had spoken to Kristi Roberts

    and Skinner. Both told Hauck of DEA investigation and arrest of Kristi Roberts, Laura

    Ball, and Dena Dobbs. Hauck knew Roberts and Dobbs from July 5, 2003.

Hauck's cell phone records would prove calls to DEA and Roberts, and NONE to Skinner. Skinner requested phone records and Det. Watkins obtained Hauck's records.

    a. First interview with Hauck, dated August 14/15/16 of 2003

Proof that Hauck knew Kristi Roberts had been interviewed by DEA.

    a. O.R. #329

On July 16, 2003, DEA Agents Mieir and Adcock pick Hauck up at Oklahoma City bus station and take him to OKC DEA office, where FBI Agent Richard A. Colladi interviews Hauck – the alleged first debrief of William Hauck by ANY law enforcement as to alleged kidnapping of Green and into alleged activities of Skinner.

    a. O.R. #248-#257

    b. Bates Stamped #362-#371

Hauck provides information on Cole, Green, Skinner, Roberts, Wynn, Wright, Stetler, Doubletree Hotel rooms 1409, 1411, and 1513, and on Premiere Inn (Texas), room #116. Hauck gives information on Skinner's Porsche, Bill Wynn's address and phone numbers, and information Hauck had found on the internet as to Skinner and Boris Olarte.

    a. O.R. #256, Item #37

15. On July 18, 2003, DEA Agents Weaver and Barnett, along with FBI Agent Sikes, interview Brandon Green. Green gives his version of the alleged kidnapping, but only after being filled in by Kristi Roberts. Green does not know Hauck's last name, phone number, or address.

    a. O.R. #264-266

16. On July 27, 2003, DEA Agents Adcock, Boyd, and Barnett meet with Hauck (O.R. #218, Items #1 and #2) and Hauck meets with Skinner (points #3 and #4). During this, DEA learned of M. Chasteen phone number address, and of Skinner's hotel.

17. On July 31, 2003, Hauck meets with DEA Agents Kidwell, Weaver, and Barnett (O.R. #258-262). Hauck gives information of alleged events at Doubletree Hotel. DEA contacts Det. Watkins on July 31, 2003 and gives him information, which is used by Watkins to obtain a warrant.

After all above and before ANY investigation (other than no. 17) by Tulsa Police – DEA turns over background reports of all concerned (O.R. #334, Point #3) and DEA has Hauck contact Det. Watkins. DEA gives handwritten notes to Watkins. Please refer to *Kastigar* motion filed August 4, 2005, pgs. 12-20, O.R. #323-#331, and O.R. #334-#337, pgs. 23-26. In mid September, 2003, Tulsa County D.A.'s Office files complaint on Skinner.

## GROUND FOUR:

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

## LEGAL RIGHTS AND PRIVILEGES OF WHICH PETITIONER WAS DEPRIVED:

Petitioner was denied the right to reasonably effective assistance of counsel, guaranteed by both the U.S. Constitution in the Sixth, Eighth, and Fourteenth Amendments.

## FACTS OF THE CASE

Appellate counsel Gloyd McCoy lied and stated he raised numerous propositions that were not raised. McCoy was dishonest, deceitful, uncommunicative and unresponsive, and thoroughly incompetent. Petitioner fired McCoy, hired another lawyer, but then was forced to rely on incompetent counsel because OCCA would not allow Petitioner to fire McCoy, hire a new attorney, or proceed Pro Se.

A glaring example of McCoy's ineffectiveness as appellate counsel is demonstrated by the fact that the Reply Brief to the State's Response to Petitioner's Direct Appeal was filed more than (60) sixty days after the deadline. Even more troubling is that this took place under Judge Lumpkin's direct supervision. McCoy failed to bring up the critical "subsequent meetings" part of the immunity agreement in Petitioner's Reply Brief, despite promising Petitioner and others he would do so.

All of this was done in the time period while McCoy's state of mind and health had already caused him to be fired by Riggs-Abney law firm. OCCA knew of McCoy's condition during this period, yet still refused to allow Petitioner to fire McCoy and proceed either pro se or with other counsel. It is unconscionable that OCCA would compel Petitioner to be subject to the

incompetent counsel of someone OCCA knew to be physically and mentally unable to perform his duties as an attorney, and who already was facing numerous other bar complaints.

Brief of Appellant was filed on 10/17/08. Petitioner's reply brief was due on 11/6/08 but was not filed until 12/9/08. McCoy told petitioner Judge Lumpkin had given him permission. Direct Appeal contained numerous significant errors, including listing the State of Oklahoma as both appellant and appellee.

McCoy has subsequently been suspended from the practice of law in the State of Oklahoma due to numerous complaints of incompetence and McCoy's failure to respond to clients or the courts regarding his inability to function as counsel.

### ERRORS MADE BY:

The U.S. Attorney's Office called the federal Public Defender's Office, who then conflicted off the case Mr. Skinner's paid attorney, Kevin Adams. Judge McAllister threatened Petitioner not to have a conflict hearing (trial counsel); OCCA made numerous errors in regards to Gloyd McCoy. Error was made by OCCA Judge Chapel, who wrote the decision denying Petitioner's Direct Appeal, in that Judge Chapel was a founding member of the Riggs-Abney law firm, to which he still has close ties. Knowing that petitioner had pending action against Riggs-Abney, Judge Chapel should have recused himself from this case, as he did in many others where there was a connection with the firm. In fact, McCoy told petitioner that Chapel had recused himself in all cases where McCoy was the attorney of record.

Error was made by OCCA Judge Lumpkin, who was supervising McCoy, often – according to McCoy, and borne out by the timeline of the case – meeting personally with McCoy and allowing him to proceed with Petitioner's appeal while knowing of McCoy's debilitating

condition and circumstances. . Mr. McCoy was disbarred for **incompetence under prevailing professional norms** by the Tenth Circuit Court of Appeals. (P.C.O.R. 955-968)  This disbarment was for incompetence in a time-period concomitant with Petitioner's direct appeal and the reply brief.  (P.C.O.R. 173-174, 912 &914-915)

Mr. McCoy was suspended by the Supreme Court of the State of Oklahoma: "Clear and convincing evidence exists demonstrating that McCoy violated multiple rules of professional conduct and disciplinary rules by which each member of the Bar Association is bound.  We conclude that the respondent's professional misconduct warrants a suspension of his license to practice law of two years and one day and imposition of cost." (P.C.O.R. 943-944, certified copy of the Supreme Court of the State of Oklahoma Order)  This suspension is for acts that occurred in the same time-period as Petitioner's Direct Appeal process. (P.C.O.R. 916-935, 953-990)

### PROOF OF ABOVE STATED FACTS:

Petitioner tried to terminate Mr. McCoy many times, as evinced by the following:

- "I have since been contacted by Mr. Gloyd McCoy, the attorney handling the appeal, and he informed me that he had been fired, by Mr. Skinner, but has yet filed an Application to Withdraw." SWORN AFFIDAVIT of Mary M. Hawthorne, Official Court Reporter, Dated February 14, 2008. (O.R. 688)

- "This correspondence is to be considered official notice that I no longer require your services, due to your lack of performance, failure to keep an open communication with myself and my representatives and your failure to provide me with the Bates-stamped pages, as you have continually promised over the last twenty-two months. I find it totally reprehensible that you failed to properly file the Notice of Intent to Appeal and then lie to me about that deficiency for eleven (11) months.  Even after resolving that situation, the lies and procrastination have continued." Letter from Petitioner to Mr. McCoy, filed in Federal Court District of Nevada, Ninth Circuit, Oklahoma Bar Association, O.C.C.A., U.S. Supreme Court.  Notarized on May 12, 2008. **(P.C.O.R. 121)**

- "Mr. McCoy has been terminated for willful neglect of duty, procrastination and various continual lies. See *Exhibit A*. Mr. McCoy's actions can be considered nothing less than ineffective assistance of counsel and Appellant Skinner does not wish to allow Mr. McCoy to further jeopardize his appellate rights. Mr. Skinner has attempted to retain first-class counsel…" Motion filed by Petitioner. **(P.C.O.R. 123)** O.C.C.A Court Clerk Claims this filing has been lost. **Originally filed in Federal Court as an exhibit in 2008.**

- "Greetings. I have a great deal of difficulty with my appellate counsel, Gloyd McCoy. I have been forced to proceed on my own behalf and I have questions related to the status of my appeal time. Has the clock begun to run on the deadline to have my appeal filed? I have not received the totality of my transcripts, so I do not believe my time has started, however, I would like a definitive answer from your office." Letter from Petitioner to Court Clerk of O.C.C.A., dated May 14, 2008. **(P.C.O.R. 125)** **Originally filed in Federal Court as an exhibit in 2008.**

- **OKLAHOMA BAR ASSOCIATION RESPONSE TO COMPLAINT**, Dated Mar 16, 2008, **(P.C.O.R. 127)** **Originally filed in Federal Court as an exhibit in 2008.**

- Letter to Court Clerk of O.C.C.A, from Petitioner to O.C.C.A., dated May 20, 2008. **(P.C.O.R. 129)** **Originally filed in Federal Court as an exhibit in 2008.**

- Proof Mr. M. I. Aston came to prison housing Petitioner on June 3, 2008. **(P.C.O. R. 131)** **Originally filed in Federal Court as an exhibit in 2008.**

- Proof Petitioner hired Mr. M. I. Aston for Direct Appeal. Dated June 3, 2008. **(P.C.O.R. 133)** **Originally filed in Federal Court as an exhibit in 2008.**

- Order of O.C.C.A. Denying Petitioner Termination of Mr. McCoy, filed June 9, 2008. **(P.C.O.R. 135)** **Originally filed in Federal Court as an exhibit in 2008.**

- Statement of Petitioner concerning above. **(P.C.O.R. 138-139)** **Originally filed in Federal Court as an exhibit in 2008.**

Petitioner tried to control his Direct Appeal, dealing with an incompetent and mentally ill attorney, *scilicet*:

- "Todd is almost finished with proposition 1, which is approx. 17 pages long.
  He is not working on propositions 2 through 8, that is your responsibility.
  You never added the proposition of the lack of discovery of the FBI reports as you said you would. Do this ASAP." E-mail to Mr. McCoy. **(P.C.O.R. 162)**

- "You never added that the government induced ineffective assistance counsel, and ineffective assistance of councel [*sic*]." E-mail to Mr. McCoy, dated December 1, 2008. **(P.C.O.R. 162)**

- "You never added the claim of Hauk's sex crimes against minors." **(P.C.O.R. 162)**

- "You never changed the name from Krystal Cole to Christie Roberts in regards to the Kastigar Hearing." **(P.C.O.R. 162)**

- "Did you receive the discharge claim from New Jersey?" E-mail to Mr. McCoy dated August 4, 2008. **(P.C.O.R. 166)**

- "No one has heard from you.  Please call me at 1-800-331-3263 ASAP.  You have missed both the dates you promised to see Todd. You have not called him, and he needs to talk to you before you come to visit him.  The extension time is almost up.  Todd is working on the Kastigar proposition response.  He is not doing anything on the other propositions because he doesn't have any resources to use.  Your payment was sent to you over a week ago, which was to enable you to go visit the facility." E-mail to Mr. McCoy dated November 18, 2008. **(P.C.O.R 171)**

- "Todd called me today and said it is vital that you call him at DCC-today if possible, but tomorrow at the latest- to discuss what he says are numerous typos and missing propositions in the draft of the appeal he received." E-mail from Bill Wynn to Mr. McCoy, dated August 20, 2008. **(P.C.O.R. 146)**

The following email from Gloyd McCoy to Petitioner clearly shows McCoy's incompetence as he makes assertions that have no basis in legal fact, court rules or procedures. Additionally, it demonstrates that McCoy's incompetence would have been known to the O.C.C.A., suggesting also that the O.C.C.A. may have intentionally "invited error" in misadvising McCoy:

- "Todd, I talked with **my source at the CCA** and **was told that a motion for extra pages would be denied**. **I was also told that we could bootstrap what was left out in a motion for oral argument which can be filed in the next two weeks. I edited your 24 pages and got the gist of it in. We will make it up. Review what you think is missing and we will talk later about motion for oral argument.** Judge Charles Johnson becomes presiding judge in Jan. and we can make motions for correction and whatever we need. If I would have filed a brief over 10 pages it would have slowed things done and we would have had to do ten pages later**. This way case is at issue. You have raised everything for later use. The concept is all that is need be raised to preserve the issue.**" E-mail from Mr. McCoy to Dianna Burns to be sent to Petitioner, dated December 9, 2008. **(P.C.O.R. 173)** (Emphasis added.)

Proof of conflict between Riggs/Abney and McCoy and D.A. Harris and O.C.C.A. Judge Chapel,

*videlicet*:

- "Chapel founded one of the largest firms in Tulsa-Chapel, Riggs, Abney, Neal, he has served on several Oklahoma and Tulsa County Bar committees … and as trustee for the Oklahoma Bar Foundation."
- ABC-AGENCIES, BOARDS, AND COMMISSIONS, CHAPTER JUDICIAL BRANCH, PAGE 49, PARAGRAPH ON JUDGE CHAPEL. **(P.C.O.R. 193).**

## ADDITIONAL ARGUMENTS AND AUTHORITIES:[11]

## THE FOLLOWING WAS TAKEN EXACTLY FROM"**PETITIONER'S OPENING BRIEF"** TO O.C.C.A.[12]

Appellant's 6th Amendment claim of constitutional ineffective assistance of appellate counsel on direct appeal by Gloyd Lynn McCoy requires fact-finding outside the record. These newly discovered evidence facts were unavailable at the time Appellant's Direct Appeal was pending before O.C.C.A. The District Court of Tulsa County, State of Oklahoma had jurisdiction under § II, Rule 2.1.A(4), Title 22, Ch. 18. App.

Cf-22 O.S. 1970, 1080 Reads:

Any person who has been convicted of, or sentenced for, a crime and who claims:

a) that the conviction or the sentence was in violation of the constitution of the United States or the constitution or laws of the State;

b) That the court was without jurisdiction to impose sentence;

c) That the sentence exceeds the maximum authorized by law;

d) That there exists evidence of material facts not previously presented and heard, that requires vacation of conviction or sentence in the interest of justice;

e) NA

f) NA

g) May institute a proceeding under this act in the court in which the judgment and sentence on conviction was imposed to secure the proper relief. Excluding, a timely appeal, this act encompasses and replaces all common law and statutory methods of challenging a conviction or sentence.

## *SEE* APPENDICES (M,O) BAR JOURNAL

---

[11] Petitioner request Court to adopt filings of Petitioner's Opening Brief in support of Petition in Error to Oklahoma Court of Criminal Appeals pursuant to Federal Civil Judicial Procedure and Rules 10(C)

[12] Time does not permit Petitioner to correctly present this section. The referenced Appendices and exhibits are from O.C.C.A. filing.

Following a ten-year association with the Coyle Law Firm, the Attorney was terminated in 2003. The ending of this professional arrangement created a financial strain. For two years, McCoy operated as a Solo Practitioner…OBJ Vol. 81-No. 25, Pg. 2083.

In February 2005, the McCoy entered a six-month diversion program related to three grievances filed by his clients. The grievances involved conduct similar to that presented here. "Failure to file Appeal", "Failure to respond to client inquiries", and "Failure to keep clients advised". OBJ Vol. 81-No. 25, Pg. 2079.

In 2005, he was hired by Riggs, Abney, Neal, Turpen, Orbison, and Lewis at what he considered a salary not commensurate with his twenty-five years of experience. McCoy's employment ended in January 2008 when he was approached by a member of the firm during trial and told his services were no longer needed. OBJ Vol. 81-No. 25, Pg. 2083.

Approximately eight months after leaving the second firm and having moved his practice into his home, the respondent's wife was admitted to the hospital and diagnosed with having sepsis. Although, she survived, she was left in a debilitative state and required subsequent medical treatment for an eye problem exacerbated by her diabetes.

From January 2008, until February (2009) of the next year, the respondent was the primary care giver for his wife and children. He was faced with large medical bills for which there was no insurance coverage. OBJ Vol. 81-No. 25, Pgs. 2083-2084 (09/25/2010).

In March 2010, the complainant, Oklahoma Bar Association, charged respondent Gloyd Lynn McCoy with thirteen counts of demonstrating professional misconduct from the year 2005 to 2009. The hearing before the trial panel was conducted over two days. On May 21st, 2010 the trial panel issued its report recommending that Gloyd McCoy be suspended from the practice of law for two years and one day. The same day, the Bar Association filed an application to asses

74

costs in the amount of $4,938.55.

The attorney acknowledged multiple instances of misconduct involving: dishonesty, fraud, deceit, or misrepresentation; incompetence; lack of diligence; failure to communicate; mishandling of funds; and the filing of untimely responses to grievance inquiries. In addition, the attorney has been disbarred by the Tenth Circuit. OBJ Vol. 81-No. 25, Pg. 2079.

> "A claim of ineffective assistance of appellate counsel may be raised for the first time on post conviction review." *Harris v. State*, 2007 OK CR 32, 167 P.3d 438.

Exhibits (M,O), Bar Journals were published on 06/01/2010 and 09/01/2010 and were not available for the direct appeal affirmed on June 11, 2009, Case Number F-2007-1101, opinion by Judge Chapel. Petitioner presents his newly discovered evidence on his ineffective assistance of appellate counsel claim for a modification of his sentences to the bare minimum and / or a new direct appeal as a relief for denial of 6th and 14th amendment rights to the United states constitution and Oklahoma Const. Art II, §§ 6, 7, 20. In light of the record facts this new evidence requires an Evidentiary Hearing -- at a minimum – be provided by the Appellate Court.

### (EXHIBIT "A" in PCR) Sentencing Transcript

On July 6, 2006, during sentencing in Case No. CF-2003-4213, Gloyd Lynn McCoy was retained as counsel and hired to perfect Petitioner's direct appeal. Mr. McCoy advised Judge McAllister he would file all the jurisdictional documents to perfect a timely appeal. *See* Title 22, ch. 18, App., § II, Rule 2.1.B and § I, Rule 1.14(D) Oklahoma Court of Criminal Appeals Rules.

On July 23, 2007, CF-2003-4213 Application for Post-Conviction Relief was filed requesting appeal out of time.

July 24, 2007, Judge Dana Lynn Kuehn entered Order setting evidentiary hearing for

August 21, 2007, at 1:30 pm.

August 30, 2007, CF-2003-4213 Judge Dana Lynn Kuehn had entered order for findings of fact and conclusions of law and recommended O.C.C.A. grant appeal Out of Time to file on Appellate Direct Appeal.

October 17, 2007, Case No. PC-2007-969, the Oklahoma Court of Criminal Appeals entered order granting appeal out of time.

February 14, 2008, CF-2003-4213, court reporter Mary M. Hawthorne (CSR) filed a sworn affidavit that 1500 pages had been completed, but needed the rest of her fees to provide the rest of the records. She was advised by Gloyd Lynn McCoy he had been fired by Mr. Skinner.

March 11, 2008, Case No. F-2007-1101, O.C.C.A. Judge Gary L. Lumpkin entered order directing Mr. McCoy to show cause why the direct appeal should not be dismissed for failure to complete filing transcript records.

**APPENDIX J:** May 12, 2008 Appellant notified Mr. McCoy that he was fired for his failure to consult, communicate and keep informed about the progress of direct appeal.

**APPENDIX P:** May 14, 2008 Appellant Skinner sent a letter of notice to the O.C.C.A. Clerk's Office that Mr. McCoy no longer no longer represented him as attorney of record on direct appeal.

**APPENDIX Q:** May 16, 2008 , Case No. IC-2008-466 Appellant filed an Oklahoma Bar Grievance against Gloyd Lynn McCoy. (Also *see* Appendix N.)

**APPENDIX R:** May 20, 2008, Appellant Skinner reiterated McCoy was no longer attorney of record and proceeding *pro-se*.

**APPENDICES S,T**: June 3, 2008, Appellant hired retained counsel Michael I. Aston to

76

perfect direct appeal and replace Mr. McCoy having being fired be Appellant.

**APPENDIX U:** June 9, 2008, Case No. F-2007 1101, O.C.C.A. Judge Lumpkin denied Appellant's *Pro Se* motion to disqualify Gloyd Lynn McCoy from handling the direct appeal. Without any clarification of the order granting Mr. McCoy's motion to withdraw or dismiss Appellant's motion, Mr. McCoy did continue to pursue the direct appeal against Appellant's wishes.

<u>APPENDIX (L) "E-MAIL"</u>

1) August 01, 2008, 10:35 am (By Ms. Dianne Burns)
2) August 04, 2008, 10:29 am (By Ms. Burns)
3) August 04, 2008, 10:49 am (By Ms. Burns)
4) October 27, 2008, 11:41 am (By Ms. Burns)
5) October 28, 2008, 11:09 am (By Ms. Burns)
6) October 29, 2008, 11:34 am (By Ms. Burns)
7) November 03, 2008, 9:59 am (By Ms. Burns)
8) November 05, 2008, 10:24 (By Ms. Burns)
9) November 18, 2008, 12:54 pm (By Ms. Burns)
10) November 20, 2008, 12:13 pm (By Ms. Burns)
11) December 01, 2008, 11:52 am (By Ms. Burns)
12) December 02, 2008, 3:15 pm (By Ms. Burns)
13) December 09, 2008, 2:16 pm (By Ms. Burns)
14) December 10, 2008, 12:26 pm (By Ms. Burns)
15) December 16, 2008, 4:35 pm (By Ms. Burns)
16) January 05, 2009, 3:25 am (By Ms. Burns)
17) January 20, 2009, 3:04 pm (By Ms. Burns)

<u>APPENDIX (K) "E-MAIL"</u>

1) August 20, 2008, 4:05pm (By Mr. Bill Wynn)
2) November 10, 2008, 3:04 pm (By Mr. Wynn)
3) December 10, 2008, 2:20 pm (By Mr. Wynn)
4) December 12, 2008, 12:58 pm (By Mr. Wynn)
5) May 1, 2009, 2:04 pm (By Mr. Wynn)
6) May 29, 2009, 3:18 pm (By Mr. Wynn)
7) June 30, 2009, 10:37 am (By Mr. Wynn)
8) July 02, 2009, 3:33 pm (By Mr. Wynn)
9) August 31, 2009, 11:48 am (By Mr. Wynn)
10) September 11, 2009, 1:03pm (By Mr. Wynn)
11) September 16, 2009, 9:43 am (By Mr. Wynn)
12) September 21, 2009, 6:45pm (By Mr. Wynn)

13) October 14, 2009, 3:18 pm (By Mr. Wynn)

Mr. McCoy was constantly concerned with fees. *See* (K-3/12-10-08/2:20 pm); *See* (K-4/12-12-08/12:58 pm) *See* (L-9/11-18-08/12:54 pm); *See* (L-5/10-28-2008/11:09 am); *See* (L-6/10-29-2008/11:34 am); *See* (L-15/ 12-16-2008/4:35 pm) Mr. McCoy made it clear he was under a financial strain due to medical bills.

**APPENDIX K:** 09/01/2010 Mr. William R. Wynn submitted a full statement of his opinion about the conduct of Mr. Gloyd L McCoy. This said from mid 2006 through 2009 described Mr. McCoy as "hard to contact", "evasive", vague", and "untruthful".


ADDITIONAL EVIDENCE SHOWN IN APPLICATION FOR PCR

(A) PICK UP LEGAL RECORDS

At least six weeks communication took place before legal documents and court records were returned by Mr. McCoy. *See*  (K-9/August 31,2009 / 11:48 am); *See* (K-11/ September 11, 2009 / 1:03 pm); *See* (K-10 / September 16, 2009 / 9:43 am); *See* (K-12/ September 21, 2009 / 6:45 pm); *See* (K-13 / October 14, 2009 / 3:11 pm).

(B) MISSING PROPOSITION FBI REPORTS

For more than nine months Appellant requested Mr. McCoy to raise a proposition on direct appeal regarding the FBI files under *Brady v. Maryland, See* (K-3 / August 20, 2008 / 4:05 pm); *See* (L-11 / December 11, 2008 / 11:52 am); *See* (L-14 / December 10, 2008 / 12:26 pm); *See* (K-9 / May 29, 2009 / 3:18 pm).

(C) NAME CHANGE TO KRISTI ROBERTS

For six months Appellant requested Mr. McCoy change the name of Krystal Cole to Kristi Roberts in *Kastigar* Hearing. *See* (L-10/ November 20, 2008/12:13 pm); *See* (L-

11/December 11, 2008/11:52 am); *See* (L-14/December 10, 2008/12:26 pm); *See* (L-16/January

05, 2009/3:25 pm); *See* (L-17/ January 20, 2009/3:04 pm); *See* (K-9/May 29, 2009/3:18 pm).

### (D) NEW CONTACT INFORMATION REQUEST

Two months were spent obtaining new information to communicate with Mr. McCoy.

*See* (L-4/October 27, 2008/11:41 am); *See* (L-5/ October 28, 2008/ 11:09 am); *See* (L-6/October

29, 2008 /11:34 pm); *See* (L-16/January 05, 2009/3:25 pm).

### (E) WIFE IN HOSPITAL

*See* (L-6/October 29, 2008/11:34 am).

### (F) FAILURE TO RAISE INEFFECTIVE COUNSEL

*See* (L-11/ December 01, 2008/11:52 am); *See* L-14/ December 10, 2008 /12:26 pm).

Appellant counsel Mr. McCoy never added the proposition of government-induced ineffective

assistance of trial counsel, interfering with Petitioner's 6th and 14th Amendment rights under the

United States Constitution and the Oklahoma Constitution Article II, §§ 6, 7, 20.

### (G) FEE REQUEST BY MR. MCCOY

*See* (L-5/October 28, 2008/ 11:09 am); *See* (L-6/ October 29,2008/11:34 am); *See* (L-9/

November 18, 2008/12:54 pm); *See* (L-15/ December 16, 2008/ 4:35 pm).

### (H) MS. VICKI HARRIS WYATT, PH.D.

March 4, 2010, Treatment summary by treating physician reads: "Treatment Summary /

Diagnoses" in other words, his experience and knowledge of his area of law allowed him to manage, but not at this typical level."

June 11, 2009, F-2007-1101, Opinion by Judge Chapel, reads in a material issue of fact: "within his Brief Skinner makes a number of factually ridiculous claims".

Appellant counsel McCoy's deficient performance is acknowledged by the treating physician and the O.C.C.A. opinion. Clearly Appellant counsel's physical, emotional, financial conditions outweighed Appellant counsel's performance and could not and would not maintain a constitutional level of performance of a reasonable confident defense attorney.

The Oklahoma Bar Association acknowledged Mr. McCoy's lack of responses to the Bar's complaint were incomplete and inadequate. Propositions on direct appeal completely or adequately addressed by Mr. McCoy's brief and reply brief filed in Case Number F-2007-1101.

On November 15, 2010, District Judge Kurt Glassco abused his discretion in failing to hold an evidentiary hearing on a genuine material issue of fact pursuant to 22 O.S. 1970, 1084, 1083(b), 1085-1066. Appellant was entitled to an evidentiary hearing to obtain witnesses, present evidence in support of his post-conviction application filed in Case CF-2003-4213. The Order denying Application for post conviction relief, filed on November 16, 2010, must be reversed and remanded to hold evidentiary hearing as required by statute, O.S. 1970,1084-1083(b).

Additionally, it is incomprehensible that District Attorney Tim Harris or his office was allowed to directly reply to Petitioner's Application for Post-Conviction Relief, or indeed in any related motions or court proceedings, as Mr. Harris is a named Respondent in this case and it is alleged in Petitioner's complaint that Mr. Harris' office has been engaged in ongoing unethical and/or criminal conduct against Petitioner over the past several years. This has taken place during the time that Mr. Harris has received substantial financial benefit in the form of campaign

contributions from the law offices of Riggs-Abney, another direct participant in these matters. The appropriate course of action would be for a conflict prosecutor, special counsel, or a special independent prosecutor to act on behalf of Respondents in this case.

### RELEVANT CITATIONS:

*U.S. v. Cronic*, 446 U.S. 648 (1984); *Harrington v. Richter*, 131 S.Ct. 770 (2011); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985); *Smith v. Robbins,* 528 U.S. 259 (2000)*; Cargle v. Mullin*, 317 F.3d 1196 (10th Circuit 2003); *Fisher v. Gibson*, 282 F.3d 1283 (10th Circuit 2002); *Grant v. State*, 2004 OK CR 24,95 P.3d 178; *Pearl Smith v. Oklahoma*, 2006 OK CR 38; *Lott v. State*, 2004 OK CR 27,98, P.3d, *Stiles v. State*, 66 OBJ 2899 (OCCA 1995).

## GROUND FIVE:

### INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL TO CORRECTLY ARTICULATE SUBSEQUENT MEETINGS AND JULY 8TH MEETING IN THE REPLY BRIEF TO OKLAHOMA COURT OF CRIMINAL APPEALS KASTIGAR IMMUNITY VIOLATION AND FIFTH AMENDMENT VIOLATION

### LEGAL RIGHTS AND PRIVILEGES OF WHICH PETITIONER WAS DEPRIVED:

Petitioner was denied the right to reasonably effective assistance of counsel, guaranteed by both the U.S. Constitution in the Sixth, Eighth, and Fourteenth Amendments.  Petitioner was denied the protection against self-incrimination guaranteed by the Fifth Amendment to the U.S. Constitution, the United States Code, and the Oklahoma Constitution in Article II § 21.

### FACTS OF THE CASE / ERRORS MADE BY:

This claim was raised in Direct Appeal; however, Appellate counsel reneged on his promise and duty to raise it adequately by failing to articulate "subsequent meetings" aspect of Petitioner's Immunity Contract.  It was raised in post-conviction proceedings and in pretrial *Kastigar* hearings. Mr. McCoy's incompetence is demonstrated by his abject failure in drafting Petitioner's reply brief to articulate the "subsequent meetings" clause of the immunity contract and by his failure to competently show the fact that Petitioner met with DEA agents after the alleged kidnapping and assault, but prior to Tulsa Police investigation and prior to Tulsa District Attorney filing charges.  He failed to articulate this in the reply while claiming he had included these key facts. (Gloyd McCoy E-mails: P.C.O.R.-141-144,146,148,149,150,152 160,162,164-168,170-171,173-175)

> (2) In exchange for your agreement to cooperate with the undersigned and/or other federal agents, the United States Department of Justice, narcotic and Dangerous Drug Section agrees that **no statement or other information (including documents) given by you during this and subsequent meetings will be used directly or indirectly against you in any criminal case,** as those terms are understood in 18 U.S.C. §6002, subject to the provisions of this letter. (Emphasis added.)

O.C.C.A. failed to address this issue, even though the claim was in the record time and time again. *See,* item no. 2, O.R. pp.92-93, 197-198, 341-342.

State courts have unreasonably interpreted and applied *Kastigar* to the instant case. *Kastigar* requires that Petitioner "only show that he testified under a grant of immunity in order to shift the heavy burden of proving that all the evidence it proposes to use was derived from legitimate and independent sources." 406 U.S. at 460 (Petitioner was granted immunity under the same statute as Mr. Kastigar.)  Petitioner has met his burden, so the government's burden of proof "is not limited to the negation of taint, rather it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." 406 U.S. 460

Based on the sworn testimony of witnesses shown above, the government cannot possibly meet this burden.  All of the State's evidence can be traced back to the derivative use of Petitioner's immunized statements: to his disclosure regarding Krystle Cole and his introduction of Cole to DEA agents.  State courts have failed to hold the government to this burden as well as the requirements of *Elkins*, where as in the instant case agents of the federal government sought to circumvent restrictions the law placed on themselves by handing information, in this case protected by an immunity agreement, to state officers.

There is no reasonable argument that would support counsel's failure to counter in the reply brief the correct set of facts. Mr. McCoy failed to properly articulate a "dead bang winner". O.C.C.A. refused to grant Petitioner an evidentiary hearing as to ineffective assistance of appellate counsel (P.C.O.R. 869-871).

The Supreme Court of the State of Oklahoma wrote: "We acknowledge the attorney's evident medical issues, debilitating depression coupled within attention deficit disorder, and their contribution to his actions. Nevertheless, in consideration of the facts and upon *de novo* review, we determine that the respondent's conduct resulting in **incurable harm to the rights of those he represented**, retaining unearned fees, **continued representation of clients while alleging his incapacity to do so**, causing embarrassment to the legal profession and to this Court". (Emphasis added. Page 2, of Order. P.C.O.R. 913) "[McCoy]… suffers from mental and physical conditions rendering him incapable of the practice of law…" in *Oklahoma Bar Journal, OBJ, vol. 81, No.25, page 2086.* (P.C.O.R. 188)

*See also, Appellant Brief of Gordon Todd Skinner, particularly pp.15-17, OCCA Case # F-2007-1101.*

### RELEVANT CITATIONS:

*U.S. v. Cronic*, 446 U.S. 648 (1984); *Harrington v. Richter*, 131 S.Ct. 770 (2011); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985); *Smith v. Robbins,* 528 U.S. 259 (2000)*; Cargle v. Mullin*, 317 F.3d 1196 (10th Circuit 2003); *Fisher v. Gibson*, 282 F.3d 1283 (10th Circuit 2002); *Grant v. State*, 2004 OK CR 24,95 P.3d 178; *Pearl Smith v. Oklahoma*, 2006 OK CR 38; *Lott v. State*, 2004 OK CR 27, 98, P.3d, *Stiles v. State*, 66 OBJ 2899 (OCCA 1995).*Kastigar v. U.S.,* 406 U.S. 441 (1972); *Marchetti v. U.S.,* 390 U.S. 39 (1968); *U.S. v. Hubbell*, 530 U.S. 27 (2000); *Murphy v. Waterfront*

*Commission*, 378 U.S. 52 (1964); *Garrity v, New Jersey*, 385 U.S. 493; *Brown v. Walker*, 161

U.S. 591; *U.S. v. North*, 910 F2d 843 (D.C. Cir. 1990); *Elkins v. U.S.*, 364 U.S. 206 (1960),

Brown.

### PROOF OF ABOVE STATED FACTS:

The facts supporting this claim are set forth above in Ground One.

Petitioner tried to terminate Mr. McCoy many times, as evinced by the following:

- "I have since been contacted by Mr. Gloyd McCoy, the attorney handling the appeal, and he informed me that he had been fired, by Mr. Skinner, but has yet filed an Application to Withdraw." SWORN AFFIDAVIT of Mary M. Hawthorne, Official Court Reporter, Dated February 14, 2008. (O.R. 688)

- "This correspondence is to be considered official notice that I no longer require your services, due to your lack of performance, failure to keep an open communication with myself and my representatives and your failure to provide me with the Bates-stamped pages, as you have continually promised over the last twenty-two months. I find it totally reprehensible that you failed to properly file the Notice of Intent to Appeal and then lie to me about that deficiency for eleven (11) months.   Even after resolving that situation, the lies and procrastination have continued." Letter from Petitioner to Mr. McCoy, filed in Federal Court District of Nevada, Ninth Circuit, Oklahoma Bar Association, O.C.C.A., U.S. Supreme Court.   Notarized on May 12, 2008. (**P.C.O.R. 121**)

- "Mr. McCoy has been terminated for willful neglect of duty, procrastination and various continual lies.   See *Exhibit A*.   Mr. McCoy's actions can be considered nothing less than ineffective assistance of counsel and Appellant Skinner does not wish to allow Mr. McCoy to further jeopardize his appellate rights.  Mr. Skinner has attempted to retain first-class counsel..." Motion filed by Petitioner. (**P.C.O.R. 123**) O.C.C.A Court Clerk Claims this filing has been lost. **Originally filed in Federal Court as an exhibit in 2008.**

- "Greetings. I have a great deal of difficulty with my appellate counsel, Gloyd McCoy.  I have been forced to proceed on my own behalf and I have questions related to the status of my appeal time.  Has the clock begun to run on the deadline to have my appeal filed?  I have not received the totality of my transcripts, so I do not believe my time has

started, however, I would like a definitive answer from your office." Letter from Petitioner to Court Clerk of O.C.C.A., dated May 14, 2008. **(P.C.O.R. 125)   Originally filed in Federal Court as an exhibit in 2008.**

- **OKLAHOMA     BAR     ASSOCIATION     RESPONSE     TO COMPLAINT**, Dated Mar 16, 2008, **(P.C.O.R. 127) Originally filed in Federal Court as an exhibit in 2008.**

- Letter to Court Clerk of O.C.C.A, from Petitioner to O.C.C.A., dated May 20, 2008. **(P.C.O.R. 129) Originally filed in Federal Court as an exhibit in 2008.**

- Proof Mr. M. I. Aston came to prison housing Petitioner on June 3, 2008. **(P.C.O. R. 131)   Originally filed in Federal Court as an exhibit in 2008.**

- Proof Petitioner hired Mr. M. I. Aston for Direct Appeal.  Dated June 3, 2008. **(P.C.O.R. 133)   Originally filed in Federal Court as an exhibit in 2008.**

- Order of O.C.C.A. Denying Petitioner Termination of Mr. McCoy, filed June 9, 2008. **(P.C.O.R. 135)  Originally filed in Federal Court as an exhibit in 2008.**

- Statement of Petitioner concerning above. **(P.C.O.R. 138-139) Originally filed in Federal Court as an exhibit in 2008.**


Petitioner tried to control his Direct Appeal, dealing with an incompetent and mentally ill

attorney, *scilicet*:

- "Todd is almost finished with proposition 1, which is approx. 17 pages long.
  He is not working on propositions 2 through 8, that is your responsibility.
  You never added the proposition of the lack of discovery of the FBI reports as you said you would.  Do this ASAP." E-mail to Mr. McCoy. **(P.C.O.R. 162)**

- "You never added that the government induced ineffective assistance counsel, and ineffective assistance of councel [*sic*]." E-mail to Mr. McCoy, dated December 1, 2008. **(P.C.O.R. 162)**

- "You never added the claim of Hauk's sex crimes against minors." **(P.C.O.R. 162)**

- "You never changed the name from Krystal Cole to Christie Roberts in regards to the Kastigar Hearing." **(P.C.O.R. 162)**

- "Did you receive the discharge claim from New Jersey?" E-mail to Mr. McCoy dated August 4, 2008. **(P.C.O.R. 166)**

- "No one has heard from you.  Please call me at 1-800-331-3263 ASAP.  You have missed both the dates you promised to see Todd. You have not called him, and he needs to talk to you before you come to visit him.  The extension time is almost up.  Todd is working on the Kastigar proposition response.  He is not doing anything on the other propositions because he doesn't have any resources to use.  Your payment was sent to you over a week ago, which was to enable you to go visit the facility." E-mail to Mr. McCoy dated November 18, 2008. **(P.C.O.R 171)**

- "Todd called me today and said it is vital that you call him at DCC-today if possible, but tomorrow at the latest- to discuss what he says are numerous typos and missing propositions in the draft of the appeal he received." E-mail from Bill Wynn to Mr. McCoy, dated August 20, 2008. **(P.C.O.R. 146)**

The following email from Gloyd McCoy to Petitioner clearly shows McCoy's

incompetence as he makes assertions that have no basis in legal fact, court rules or procedures.

Additionally, it demonstrates that McCoy's incompetence would have been known to the

O.C.C.A., suggesting also that the O.C.C.A. may have intentionally "invited error" in

misadvising McCoy:

- **"Todd, I talked with my source at the CCA and was told that a motion for extra pages would be denied.  I was also told that we could bootstrap what was left out in a motion for oral argument which can be filed in the next two weeks.  I edited your 24 pages and got the gist of it in.  We will make it up.  Review what you think is missing and we will talk later about motion for oral argument.** Judge Charles Johnson becomes presiding judge in Jan. and we can make motions for correction and whatever we need.  If I would have filed a brief over 10 pages it would have slowed things

done and we would have had to do ten pages later. **This way case is at issue. You have raised everything for later use. The concept is all that is need be raised to preserve the issue**." E-mail from Mr. McCoy to Dianna Burns to be sent to Petitioner, dated December 9, 2008. (**P.C.O.R. 173**) (Emphasis added.)

Proof of conflict between Riggs/Abney and McCoy and D.A. Harris and O.C.C.A. Judge

Chapel, *videlicet*:

- "Chapel founded one of the largest firms in Tulsa-Chapel, Riggs, Abney, Neal, he has served on several Oklahoma and Tulsa County Bar committees … and as trustee for the Oklahoma Bar Foundation."
- ABC-AGENCIES, BOARDS, AND COMMISSIONS, CHAPTER JUDICIAL BRANCH, PAGE 49, PARAGRAPH ON JUDGE CHAPEL. (**P.C.O.R. 193**).

## GROUND SIX:

### INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILURE TO COMPETENTLY ARTICULATE A CONSTITUTIONAL DUE PROCESS *BRADY* VIOLATION

**This was originally raised as Proposition II in Petitioner's Direct Appeal.** DA's office failed to turn over exculpatory testimony of Brandon Green at Krystle Cole's PSI. This is an Actual Innocence claim and "dead bang winner".

### RELEVANT CITATIONS:

*Brady v. Maryland*, 378 U.S. 83 (1963); *Smith v. Robbins*, 528 U.S. 259 (2000); *U.S. v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985); *Allen v. District Court of Washington County*, 1990 OK CR 83, 803, P.2d 1164.

88

## GROUND SEVEN:

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILURE TO COMPETENTLY ARTICULATE A CRITICAL DUE PROCESS AND PROSECUTORIAL MISCONDUCT VIOLATION

Petitioner's conviction was obtained as a result of prosecutorial misconduct.

This issue was raised as Proposition IV in Petitioner's Direct Appeal.

### RELEVANT CITATIONS:

*Smith v. Robbins*, 528 U.S. 259 (2000); *U.S. v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985).

## GROUND EIGHT:

## PETITIONER'S CONVICTION WAS OBTAINED BY ABUSE OF DISCRETION BY STATE COURTS.  DECISIONS OF THE STATE COURTS, INCLUDING EVIDENTIARY RULINGS, WERE SO ARBITRARY AND CAPRICIOUS AS TO CONSTITUTE AN INDEPENDENT DUE PROCESS VIOLATION.

This violated Petitioner's rights to due process of law and to a fair trial as guaranteed by the Bill of Rights of the United States, Constitutional Amendments 5 and 14 and the Bill of Rights of Oklahoma, Constitutional Article II §§ 7, 20 and 30.  See *Fields v. Gibson*, 277 F3d 1203, 1220 (10th Cir. 2002) citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Notaro v. U.S.*, 363 F2d 169 (9th Cir. 1966); and *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

**Argument and Authorities**

The district court's conclusions of law were without basis and not referenced to any facts in the record.  The record supports Petitioner's dead-bang-winner claims, but the district court ignored those facts.  Furthermore, the district court improperly denied Petitioner evidentiary hearing thereby excluding newly discovered probative evidence from outside the record central to Petitioner's claims and further supportive of them.

In its Order Denying Post-Conviction Relief (PCR) (Appendix A) the district court made the following erroneous decisions and misrepresentations of fact:

a.      Contrary to the Court's statement on p.1, ¶2 of the Order (Appendix A), as issues central to Petitioner's claims cannot be resolved on the trial record alone, and the instant case requires an evidentiary hearing. Title 22 Okl.St. § 1084, *Fowler v. State*, 896 P.2d 566, 570-71 (Okla.Crim.App. 1995), *Pickens v. State*, Okla.Crim.App., 910  P.2d 1063(1996); *Williams v. Taylor*, 120 S.Ct. 1495 (2000); *Smith v. Robbins*, 528 U.S. 259 (2000) and *Allen v. State*, Okla.Crim.App., 909 P.2d 039 (1995) and supplements the record to the *TRAVERSE* Reply to Respondents' Response to Petitioner's Application for Post-Conviction Relief, specifically as it pertains to Petitioner's motion that this Court grant Petitioner Evidentiary Hearings in support of Petitioner's Ineffective Assistance of Appellate Counsel Claim and Ineffective Assistance of Trial Counsel Claim as raised in Petitioner's Application for Post-Conviction Relief.

Title 22 Okl.St. § 1084 is the appropriate and sole statute controlling such evidentiary hearings. Title 22, Rules of Oklahoma Court of Criminal Appeals, 3.11, is ineffective and inadequate with respect to this matter, by ruling of the Tenth Circuit, *Fairchild v. Workman*, 579 F.3d 1134, 1141-44, (10th Cir. 2009). Rules of Oklahoma Court of Criminal Appeals, 3.11 is

inherently a *de facto* inquisitorial process, while Title 22 Okl.St. § 1084 is an adversarial process, as universally preferred by the U.S. Supreme Court.

Petitioner raises now that Rule 3.11 is inadequate and not evenhandedly applied, therefore, a Title 22 Okl.St. § 1084 hearing is mandatory. This Court is without authority to refuse to grant Petitioner the requested evidentiary hearings, and such denial would be an abuse of the discretion of this Court. *Coronado v. Ward*, 517 F.3d 1212, 1217, (10th Cir. 2008); *Anderson v. Att'y Gen. of Kansas*, 425 F.3d 853, 858 (10th Cir. 2005); *Swazo v. Wyoming Dep't of Corr.*, 23 F.3d 332, 333-34 (10th Cir. 1994).

At the heart of Petitioner's claim lies the indisputable fact that Appellate Counsel Gloyd McCoy was incompetent and utterly ineffective while handling Petitioner's Direct Appeal, failing to raise numerous "dead-bang winners"[13] in Petitioner's Direct Appeal, and failing to competently articulate those "dead-bang winners" that were raised.

As is now known to this Court, McCoy's state of mental and physical health was so fragile that he was rendered incapable of performing even the most basic functions of his job. This was acknowledged by the Supreme Court of the State of Oklahoma in its affirmation of the Oklahoma Bar Association's suspension of McCoy from the practice of law.

> The attorney acknowledged multiple instances of misconduct involving: dishonesty, fraud, deceit, or misrepresentation; incompetence including accepting cases while under a disability; lack of diligence; failure to communicate; mishandling of funds; and the filing of untimely responses to grievance inquiries.
> *State of Oklahoma, ex rel., Oklahoma Bar Association v. Gloyd Lynn McCoy*, 2010 OK 67.

---

[13] A dead-bang winner is defined as "an issue which was obvious from the trial record and would have resulted in a reversal on appeal." James v. McKee, 2009 U.S. Dist. LEXIS 102380 (E.D. Mich. Nov. 3, 2009)

The court in the above referenced case cites McCoy's "evident debilitating depression coupled with an attention deficit disorder", determining that McCoy's conduct resulted in "incurable harm to the rights of those he represented".[14] (*See* Petitioner's Opening Brief in support of Petition in Error, Appendix H.)

According to medical records describing McCoy's "Major Depressive Disorder" and "Attention Deficit disorder" submitted as "Defendant's Exhibit 7" in McCoy's "Response Requesting that Oklahoma Supreme Court Not Follow Tenth Circuit's Disbarment Order"[15], "Gloyd McCoy presented initially in march 2003…" The document goes on to describe how McCoy had been fired from his position at the Coyle Law Firm after a ten-year association with the firm, and that "McCoy suffered from situational depression and was emotionally devastated by the unexpected termination."

"Mr. McCoy was not prepared financially or emotionally to operate a solo practice," the medical record continues, adding that he needed a highly structured and supportive environment were he to continue practicing while battling his debilitating mental illnesses. He hoped to find such an environment when he joined the firm of Riggs, Abney, Neal, Turpen, Orbison & Lewis in October 2005, however the firm reportedly underpaid him and did not allow him access to the support infrastructure he needed.

> The very strong sense of betrayal he felt from his former partner (Mr. Coyle) was renewed at Riggs Abney law firm when his new firm added insult to injury by paying him such a small salary and leaving him to his own devises at the firm. While he was given access to a paralegal, Mr. McCoy complained to his superiors that he didn't have the type of assistance he needed with filing, organization, collating briefs, scheduling appointments,

---

[14] *State of Oklahoma, ex rel., Oklahoma Bar Association v. Gloyd Lynn McCoy*, 2010 OK 67.
[15] *State of Oklahoma, ex rel., Oklahoma Bar Association v. Gloyd Lynn McCoy*, "Response Requesting that Oklahoma Supreme Court Not Follow Tenth Circuit's Disbarment Order", filed May 17, 2010.

> maintaining his calendar, etc. – all of which is consistent with
> issues typical of ADD.
> (*See* Appendix I to Petitioner's Opening Brief in Support of Petition in
> Error)

The fact that the Oklahoma Court of Criminal Appeals was aware of McCoy's condition – a condition that left him unable to continue in the competent practice of law – during the time that McCoy was representing Petitioner and many other clients and still allowed and encouraged him to act as counsel, is shocking enough, but what is truly astonishing and unconscionable is that O.C.C.A. refused to allow Petitioner to fire McCoy when Petitioner became aware that his Appellate Counsel was incapable of doing his job.

Petitioner was **prejudiced** by Mr. McCoy's **incompetence** in that McCoy failed in Petitioner's Direct Appeal to raise the following "dead-bang winners": Ineffective Assistance of Trial Counsel for failing to inform the jury of a previous fictitious kidnapping case raised by the very same witnesses and alleged victim in the case of which Petitioner was convicted (both sides knew about this prior false kidnapping claim because they had cross-examined witnesses about it during *Kastigar* hearings); Ineffective Assistance of Trial Counsel for failing to inform the jury and failing to properly argue before the judge that the New Jersey case used to illegally enhance Petitioner's sentence was more than ten years old; Ineffective Assistance of Trial Counsel for failing to inform the jury that the alleged victim was on pre-trial release bond and had lied to authorities about being in Galveston, Texas. (See O.R. 245, point number 4.); Ineffective Assistance of Trial Counsel for failing to inform the jury that the F.B.I. – the proper authorities to handle alleged interstate kidnapping – had conducted an extensive investigation into the alleged kidnapping, and declined to pursue any charges against Petitioner; Ineffective Assistance of Trial Counsel for failing to inform the jury that prosecutors refused to turn over phone records

93

proving Petitioner had no direct contact with co-defendant William Hauck during the time in question.

Obviously, McCoy's failure to properly articulate those claims he did raise in the Direct Appeal severely prejudiced Petitioner's appeal. Furthermore, the State of Oklahoma has no working mechanism to raise Ineffective Assistance of Appellate Counsel for failing to raise Ineffective Assistance of Trial Counsel. This amounts to a *de facto* violation of **Procedural Due Process** as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

b.     Contrary to the Court's statement on p.3 of the Order, the Application for Post-Conviction Relief ruled on, and appealed hereby, is his First Application for post-conviction relief after direct appeal.  Petitioner had previously made an application for post-conviction relief for appeal out of time, and as that direct appeal out of time was granted, that pleading did not count as a "first" application for post-conviction relief so as to make this the "second" one. *Orange v. Calbone*, 318 F.3d 1167 (10th Cir. 2003); *Johnson v. Champion*, 288 F.3d 1215 (10th Cir. 2002).

c.     Contrary to the Court's repeated statements in the Order, Petitioner's claims are neither waived nor *res judicata.* Waiver and *res judicata* are inapplicable when, as in the instant case, appellate counsel (and trial counsel) were ineffective.  Incompetence of counsel rose to the level of ineffective assistance of counsel, prejudicing Petitioner as to the enumerated claims in Petitioner's Application for Post-Conviction Relief.

## GROUND NINE:

## THE DISTRICT COURT ERRED BY ABDICATING ITS AUTHORITY BY COPYING VERBATIM (INCLUDING TYPOGRAPHIC ERRORS) MUCH OF THE DISTRICT ATTORNEY'S RESPONSE TO PETITIONER'S APPLICATION FOR POST-CONVICTION RELIEF

This is a clear violation of the separation of powers, a violation of both the United States and Oklahoma Constitutions.

> The well known maxim "*delegate potestas non potest delegari*," applicable to the law of agency in the general and common law, is well understood and has had wider application in the construction of our federal and state constitution than it has in private law. The Federal Constitution and state constitutions of this country divide the governmental power into three branches...in carrying out that constitutional division...it is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the President, or to the Judicial branch, or if by law it attempts to invest itself or its members with either executive or judicial power. This is not to say that the three branches are not coordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the constitutional field of action of another branch. *Hampton Jr. & Co. v. U.S.*, 276 U.S. 394, 405, 406 (1928).

United States Constitution, Article I §§ 8 and 9, Article II, Article III violation. Oklahoma Constitution Article I and Article II violation.

## GROUND TEN:

## THE OKLAHOMA STATE RULES AND APPEALS PROCESS CONSTITUTES A FUNDAMENTAL PROCEDURAL DUE PROCESS VIOLATION

The state's application of O.S. Title 22 § 1080 *et seq.* and O.C.C.A. Rule 3.11, in concert with state case law, rises to the rare but occurring **Procedural Due Process** violation, violating the Fifth and Fourteenth Amendments of the United States Constitution. Both provisions are "inadequately and unevenly applied".

## RELEVANT CITATIONS:

*Baldwin v. Hale*, 1. Wall. 223, 233 (1864); *Fuentes v. Shewin*, 407 U.S. 67, 80 (1972); *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004); *Joint Anti-Fascist Comm. V. McGrath*, 341 U.S. 123 (1951); *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976); *Medina v. California*, 505 U.S. 437, 445 (1992). *Wilson v. Workman*, 577 F.3d 1284, 1294 (10th Cir. *en banc* 2009); and *Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009).

## GROUND ELEVEN:

## THE DISTRICT COURT ERRED BY ALLOWING THE DISTRICT ATTORNEY (A RESPONDENT) TO ANSWER AND REPLY TO PETITIONER'S APPLICATION FOR POST-CONVICTION RELIEF.

This is a Due Process violation, violating the United States Constitution, Amendment V and Amendment XIV.

## RELEVANT CITATIONS:

*Arizona v. Fulminante*, 499 U.S. 279 (1991) and the Oklahoma Constitution, Article II §§ 7 and 20.

## GROUND TWELVE:

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILURE TO RAISE GOVERNMENT-INDUCED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

This is a Due Process Violation of Petitioner's rights under the U.S. Constitution in the Sixth, Eighth, and Fourteenth Amendments, and of the Oklahoma Constitution in Article II § 6, 7, and 20. This caused irreparable harm to Petitioner as Petitioner was unable to file writs to higher courts.

### Facts of the Case / Errors Made By:

The U.S. Attorney's Office, via the Federal Public Defenders Office, interfered with Petitioner's paid attorneys by calling the Head Public Defender and having him call Kevin Adams, who them was conflicted from the case over Petitioner's objection. Judge McAllister covered this up. The entire matter went before the 10th Circuit.

### Proof of Above Stated Facts:

In order to fully prove the above facts, Petitioner requests a Hearing, calling to the stand current counsel Michael I. Aston, prior counsel Kevin Adams, Judge Gordon McAllister, and attorneys C. Robert Burton IV and Paul D. Brunton. Petitioner seeks access to Federal Judge Kern's records and transcripts of the 10th Circuit's hearings in this matter.

### RELEVANT CITATIONS:

*Smith v. Robbins*, 528 U.S. 259 (2000); *U.S. v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985).

**GROUND THIRTEEN:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILURE TO RAISE DUE PROCESS VIOLATIONS AS PER *BRADY V. MARYLAND*, 378 U.S. 83 (1963).**

Petitioner was denied his right to due process, guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution and by the Oklahoma Constitution in Article II § 7. The State of Oklahoma failed to turn over FBI reports of FBI investigation into alleged kidnapping AND failed to turn over Department of Interior reports of their investigation.

The State of Oklahoma failed to turn over FBI reports of FBI investigation into alleged kidnapping AND failed to turn over Department of Interior reports of their investigation.

**Proof of Above Stated Facts:**

See O.R. pages #86 "To Compel full disclosure of all material", #91, #105, #142, #143, #195, #245, #248 (Collodi of Oklahoma City FBI Office), #264 (FBI Sikes)

**RELEVANT CITATIONS:**

*Brady v. Maryland*, 378 U.S. 83 (1963); *Smith v. Robbins*, 528 U.S. 259 (2000); *U.S. v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985). *U.S. v. Agurs*, 427 U.S. 97; *Strickler v. Greene*, 119 S. Ct. 1936 (1999); *Kyles v. Whitley*, 514 U.S. 419 (1995); *Chaney v. N. Brown*, 730 F.2d 1334 (1984); *Allen v. District Court of Washington County*, 1990 OK CR 83, 803, P.2d 1164.

## GROUND FOURTEEN:

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILURE TO RAISE DUE PROCESS VIOLATIONS AS PER *BRADY V. MARYLAND*, 378 U.S. 83 (1963)

Petitioner was denied his right to due process, guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution and by the Oklahoma Constitution in Article II § 7.

The State of Oklahoma failed to turn over an alleged kidnapping complaint in which the alleged victim and Krystle Cole admitted they had made up the entire case and lied in sworn affidavits. This withheld evidence was exculpatory and could have been used by trial counsel to prove Petitioner's Actual Innocence and is a "dead bang winner" claim.

### Facts of the Case / Errors Made By:

The State of Oklahoma failed to turn over an alleged kidnapping complaint in which the alleged victim and Krystle Cole admitted they had made up the entire case and lied in sworn affidavits. This withheld evidence was exculpatory and could have been used by trial counsel to prove Petitioner's **Actual Innocence**.

See *Kastigar* hearing transcript from June 12, 2006, testimony of Krystle Cole, pages 5-6.

### RELEVANT CITATIONS:

*Brady v. Maryland*, 378 U.S. 83 (1963); *Smith v. Robbins*, 528 U.S. 259 (2000); *U.S. v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985); *U.S. v Agurs*, 427 U.S. 97; *Strickler v. Greene*, 119 S. Ct. 1936 (1999); *Chaney v. N. Brown*, 730 F.2d 1334 (1984); *Smith v. New Mexico*, 50 F.3d 801 (10th Cir.); *Allen v. District Court of Washington County*, 1990 OK CR 83, 803, P.2d 1164.

## GROUND FIFTEEN:

### INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILURE TO RAISE THE ISSUE THAT PETITIONER WAS DENIED HIS RIGHT TO HAVE COMPULSORY PROCESS FOR OBTAINING WITNESSES IN HIS FAVOR, AS GUARANTEED BY THE 6TH AMENDMENT TO THE U.S. CONSTITUTION

The Tulsa U.S. Attorney's Office quashed Petitioner's subpoena of TFO Doug Kidwell (D.E.A.) and refused petitioner's 28 CFR § 16.21 *et seq*. request.

### Proof of Above Stated Facts:

Petitioner was denied access to Kristi Roberts in *Kastigar* hearing, which would have shown DEA agents at Doubletree Hotel at time of alleged crime and also the fact that DEA agents observed Petitioner Skinner at another hotel (Adams Mark).

See O.R. pages 128-131, 133, 135, and 137 and O.R. pages 142-143.

Petitioner was denied subpoena of DEA Agent Doug Kidwell.

### RELEVANT CITATIONS:

*Smith v. Robbins*, 528 U.S. 259 (2000); *U.S. v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985); *Coy v. Iowa*, 108 S. Ct. 2798.

100

## GROUND SIXTEEN:

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILURE TO RAISE THE ISSUE THAT PETITIONER WAS DENIED HIS RIGHT TO BE CONFRONTED BY THE WITNESSES AGAINST HIM, AND DENIED HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE 5TH AND 6TH AMENDMENTS TO THE U.S. CONSTITUTION**

Judge McAllister ruled that William Hauck did not have to disclose to the Jury **his prior sex conviction against a minor**. The Trial Court's ruling was an abuse of discretion.

### RELEVANT CITATIONS:

*Crawford v. Washington*, 541 U.S. 36 (2004); *Smith v. Robbins*, 528 U.S. 259 (2000); *U.S. v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985); Rules: BTW, 12 § 2403, BTW 12 § 2609, 28 Rule 609 (Federal Rule), BTW 12 § 2403 case *U.S. v. Tse*, 375 F.3d 148 (1st 2004).

## GROUND SEVENTEEN:

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILURE TO COMPETENTLY RAISE OR ARTICULATE THE ILLEGAL ENHANCEMENT OF PETITIONER'S SENTENCE**

Petitioner was illegally sentenced in second phase using stale after former conviction from New Jersey. The federal misdemeanor alluded to by the O.C.C.A. was not a crime of moral turpitude and thus could not be used to enhance the sentence. This sentence is in violation of the 5th, 8th and 14th Amendments to the U.S. Constitution.

Petitioner repeatedly told Appellate Counsel McCoy to obtain and include in the Direct Appeal a copy of Petitioner's early discharge order from the State of New Jersey, a document previous Counsel M.I. Aston had given to ADA Robertson but which the Government claimed no knowledge of at sentencing. This document proves that Petitioner's prior conviction was outside of the ten-year window and could not legally be used to enhance Petitioner's sentence. McCoy failed to obtain this document or even to competently articulate the issue of illegal sentence enhancement in Petitioner's Direct Appeal.

In Petitioner's Application for Post-Conviction Relief, Petitioner's Federal PSI/PSR – another official document proving the early discharge date – was included and argued, but was ignored by the District Court in its Order. In the meantime, another copy of the official New Jersey document was obtained and added as an exhibit to Petitioner's Brief in Support of Petition in Error, along with the Federal PSI/PSR showing same.

The O.C.C.A., in its denial of Petitioner's PCR, mysteriously ignored the Federal PSI/PSR while **erroneously stating** that the New Jersey Order of Early Termination was insufficient proof of Petitioner's claim.

Petitioner's illegally enhanced sentence is an egregious violation of Petitioner's rights as guaranteed by the 5th, 8th and 14th Amendments to the U.S. Constitution, and this **sentence must be vacated**.

### RELEVANT CITATIONS:

*Burgett v. Texas* 389 us 109 (1967); *Smith v. Robbins*, 528 U.S. 259 (2000); *U.S. v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985); *Apprendi v. N.J.*, 530 U.S. 466 (2000); *Blakely v. Washington*, 542 U.S. 296 (2004).

## GROUND EIGHTEEN:

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILURE TO RAISE A CRITICAL *BRADY V. MARYLAND* PROSECUTORIAL MISCONDUCT ISSUE

This proposition asserts Petitioner was deprived of his rights under *Brady v. Maryland* as a result of **Prosecutorial Misconduct** and **Judicial Error**.

### Facts of the Case / Errors Made By:

Alleged victim Brandon Green was allowed by Trial Judge to ramble extensively and prejudicially about a "collapsed lung" and other matters devoid of evidence and lacking any relevance to the case, a clear violation of Petitioner's rights under *Brady v. Maryland*.

Green rambles on about issues that were **not included in discovery**, nor were any corroborating medical records admitted as evidence. This is a clear reversible trial error, properly articulated by trial counsel.

### RELEVANT CITATIONS:

*Brady v. Maryland*, 378 U.S. 83 (1963); *Smith v. Robbins*, 528 U.S. 259 (2000); *U.S. v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985); *U.S. v. Agurs*, 427 U.S. 97; *Strickler v. Greene*, 119 S. Ct. 1936 (1999); *Kyle v. Whitley*, 514 U.S. 419 (1995); *Chaney v. N. Brown*, 730 F.2d 1334 (1984); *Allen v. District Court of Washington County*, 1990 OK CR 83, 803, P.2d 1164.

## GROUND NINETEEN:

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILURE TO RAISE A CRITICAL DUE PROCESS AND PROSECUTORIAL MISCONDUCT VIOLATION

**This Proposition deals with the issue of Perjured Testimony used to convict Petitioner.** Prosecutors tried to sanitize William Hauck's perjury using prior inconsistent statements method, but this does not relieve them of their burden to inform the jury about perjured testimony.

## RELEVANT CITATIONS:

*Smith v. Robbins*, 528 U.S. 259 (2000); *U.S. v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985); *Coleman v. Thompson*, 501 US 722 (1991); *Mooney v. Holohan*, 294 US 103 (1935); *McBride v. U.S.*, 446 F.2d 229 10th Circuit 1971; *Napue v. Illinois*, 360 U.S. 264, 70 S.Ct. 1173; *Miller v. Scully*, 653 F.Supp 885; 826 F.2d 1192; *Graham v. People*, 705 P.2d, 507; *Graham v. Wilson*, 645 F.Supp 664, 828 F.2d 656.

## GROUND TWENTY:

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILURE TO RAISE CRITICAL DUE PROCESS AND PROSECUTORIAL AND POLICE MISCONDUCT ISSUES.

This is a *Brady* and *Allen v. District Court of Washington County*, 1990 OK CR 83, 803, P.2d 1164 violation claim involving the withholding of exculpatory evidence which, had it been available to trial counsel, could have been used to prove Petitioner's Actual Innocence.

**Facts of the Case / Errors Made By:**

Petitioner repeatedly asked for phone records that would show no communication between Hauck and Skinner during the timeframe of the alleged events – which is not disputed – and that Hauck did have communication with parties undisclosed at trial, such as Kristi Roberts, the DEA, and possibly the FBI.

**RELEVANT CITATIONS:**

*Brady v. Maryland*, 378 U.S. 83 (1963); *Allen v. District Court of Washington County*, 1990 OK CR 83, 803, P.2d 1164; *Smith v. Robbins*, 528 U.S. 259 (2000); *U.S. v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985); *U.S. v Agurs*, 427 U.S. 97; *Strickler v. Greene*, 119 S. Ct. 1936 (1999); *Allen v. District Court of Washington County*, 1990 OK CR 83, 803, P.2d 1164; *Chaney v. N. Brown*, 730 F.2d 1334 (1984).

## GROUND TWENTY-ONE:

### INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILURE TO COMPETENTLY ARTICULATE A CRITICAL STATUTORY VIOLATION

**Petitioner's conviction was obtained in violation of the Interstate Agreement on Detainers Act (IADA).**

**RELEVANT CITATIONS:**

*Smith v. Robbins*, 528 U.S. 259 (2000); *U.S. v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985).

**GROUND TWENTY-TWO:**

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILURE TO RAISE A CRITICAL DUE PROCESS AND PROSECUTORIAL MISCONDUCT VIOLATION**

This and like violations are violations of Petitioner's rights under *Brady* and *Allen*, and a violation of Petitioner's right to Due Process under the 5th and 14th Amendments to the Constitution of the United States of America, and a violation of Petitioner's rights to be confronted with the witnesses against him, and to have compulsory process for obtaining witnesses in his favor, as guaranteed by the 6th Amendment to the Constitution of the United States of America.

Prosecutors failed to disclose to Petitioner before trial an alleged "reverse sting operation," in which Hauck offered to sell his testimony to Petitioner. This would have gone towards proving Petitioner's **Actual Innocence** because it would strike at the credibility of Hauck and Detective Gene Watkins.

ADA Steven Kunzweiler refused to testify in this matter, denying Petitioner his right to face his accusers and compel witnesses in his favor under the 6th Amendment to the U.S. Constitution.

Prosecutors repeatedly changed their story about the nature of taped conversation between Hauck and Petitioner's cousin, Michael Chasteen.

**FACTS OF THE CASE / ERRORS MADE BY:**

**Reverse Sting / William Hauck Plea Deal**
**Reference of testimony supporting this claim:**

**Page 58, Line 19:**
Discussion begins about tape that could impeach Hauck's testimony.

**Page 60, Line 1:**
Discussion regarding contents of tape.

**Page 62, Line 1:**
Steve Kunzweiler's name comes up.

**Page 62, Line 20:**
Thorp states that they were trying to get a reverse sting on a bribery attempt.
(In fact, this was not a bribery attempt by Skinner's family or a reverse sting by Tulsa police. It is a police cover-up of an extortion attempt by Hauck.)

**Page 60, Line 25:**
Hauck figures out the phone call is being taped.

**Page 61, Line 20:**
Thorp admits having knowledge of tape.

**Page 61, Line 23:**
Hauck calls his attorney, Jane Ann Cobb, who tells Hauck to tell Detective Watkins about the conversation.

**Page 62, Line 1:**
Watkins contacts Steve Kunzweiler.

**Page 62, Line 3:**
Thorp claims a plan for a wiretap was discussed but not implemented due to questions about legality.

**Page 64, Lines 5-8:**
Defense counsel Mortensen clarifies that Hauck was offered a deal of two years for his cooperation, and that otherwise Hauck would be facing 20 years to life.

**Page 64, Line 12:**
Defense counsel Adams questions why the alleged reverse sting is just now coming to light regarding the District Attorney's Office in Tulsa Count's "involvement to run a reverse sting on the family of the defendant".

**Page 64, Lines 19-25:**
Adams discusses State's failure to disclose alleged reverse sting, and expresses concerns over this.

**Page 65, Lines 10-14:**
Adams wants more discovery related to reverse sting , pointing out that such discovery has never been provided to the defense.

**Page 65, Lines 15-18:**
Thorp claims he let Mortensen "know kind of something" about the reverse sting the week before his testimony, and claims that Watkins told him the tape was blank.

**Page 66, Lines 22-25:**
Adams says that the Tulsa County District Attorney's Office apparently were involved in the alleged reverse sting "for some time" and discussed the Government calling their own prosecutors as witnesses.

107

**Page 68, Line 2:**
Mortensen acknowledges that Thorp mentioned the issue but said he had no exact details.

**Page 68, Lines 5-8:**
Thorp claims to have listened to the tape and can report fully about everything.

**Page 68, Lines 13-16:**
Mortensen questions the integrity of officers other than Thorp in the DA's office and again expresses concerns that the reverse sting was not disclosed to defense earlier.

**Page 68, Line 24 – Page 69, Line 1:**
Adams makes clear that it was Hauck who initiated the extortion attempt.

**Page 69, Lines 6-10:**
Thorp rebuts, saying a woman had approached Hauck.

**Page 69, Line 24 – page 70, Line 1:**
Adams expresses need to question Mr. Chasteen.

**Page 71, Line 8:**
Mortensen tell court the alleged reverse sting claim "looks quacky".

**Page 74, Lines 22-25:**
Mortensen raises issue of implicating potential impeachment material and cites *Allen v. Washington County* with respect to proper discovery procedure.

**Page 606, Lines 3-10:**
Watkins tells Hauck to make sure his attorney is aware of attempted bribe. (Motion Hearing – Thorp sates Hauck was told to contact Watkins by his attorney.) Also, Watkins testifies he then got a request to have the investigative division set up a sting.

**Page 606, Line 19:**
Watkins first contacted Steve Kunzweiler

**Page 606, Line 21:**
Watkins expressing some doubt regarding bribery allegations

**Page 607, Lines 8-11:**
Watkins plans to use wire to get audio tape of meeting.

**Page 607, Lines 14-19:**
Watkins says Skinner's mother contacted Watkins and told him about the audio tape she had.

**Page 607, Line 21:**
Tape is delivered to Watkins' office. Watkins claims it is blank and told Skinner's mother he needed a copy.

**Page 608, Lines 12-14:**
Watkins says Hauck told Watkins conversation stopped before he (Watkins) was aware of audio tape.

**Page 608, Lines 20-23:**
Watkins says that the tape has talk about money on it and someone asking Hauck to leave town as a favor for a friend.

**Page 617, Lines 24-25 & Page 618, Lines 1-2:**
No record of "reverse sting"

**Page 618, Line 23:**
Watkins answers "yes" to question "is Chasteen who recorded the conversations?"

**Page 620, Line 12:**
Watkins says he doesn't know who initiated conversation about money for testimony.

**Page 621, Lines 21-23:**
Watkins never asked Hauck to get a conversation going so they could obtain evidence.

**Page 621, Lines 24 & Page 622, Line 2:**
Watkins says he heard Hauck say he was offered a two-year deal for his testimony.

**Page 622, Lines 3-9:**
More testimony about Hauck's deal or the alternative.

**Page 624, Lines 16-25:**
Shows Watkins knows that Hauck didn't witness incident with phone cord but was told about it by someone.

**Page 626, Lines 19-22:**
Watkins agrees Hauck did not witness phone cord incident.

**Page 627, Lines 16-19:**
Watkins claims he has no knowledge of Hauck being recorded.

**Page 631, Lines 10-12:**
Watkins says he had been told Hauck will get a lot of time because of his priors.

## RELEVANT CITATIONS:

*Brady v. Maryland*, 378 U.S. 83 (1963); *Allen v. District Court of Washington County*, 1990 OK CR 83, 803, P.2d 1164; *Smith v. Robbins*, 528 U.S. 259 (2000); *U.S. v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985) *Allen v. District Court of Washington County*, 1990 OK CR 83, 803, P.2d 1164; Giglio v. U.S., 405 U.S. 150 (1972).

## GROUND TWENTY-THREE:

### INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILURE TO RAISE CRITICAL DUE PROCESS VIOLATIONS. STATE COURTS MADE ARBITRARY AND CAPRICIOUS DECISIONS, WHICH DENIED DUE PROCESS OF LAW AND A FAIR TRIAL

### RELEVANT CITATIONS:

*Smith v. Robbins*, 528 U.S. 259 (2000); *U.S. v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2025 (1984); *Evitts v. Lucey* 105 S.Ct. 830 (1985); *Fields v. Gibson*, 277 F.3d 1203, 1220 (10th Cir. 2002) citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Notaro v. U.S.*, 363 F.2d 169 (9th Cir. 1966); *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

**Therefore, petitioner asks that the Court grant the following relief:**

Petitioner asks that this Court undertake a *de novo* review of the above claims, and that Petitioner's Conviction and Sentence be SET ASIDE. Petitioner prays the writ of habeas corpus be issued.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on _____.

Executed on _6/17/11_____.

*[signature]*

Signature of Petitioner, Gordon Todd Skinner, *ordo lux*
INMATE NO. 556865
Joseph Harp Correctional Center
P.O. Box 548
Lexington, OK  73051

110

(2)   The time during which a properly filed application for State post-conviction or other collateral review
with respect to the pertinent judgment or claim is pending shall not be counted toward any period of
limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:

or any other relief to which petitioner may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for

Writ of Habeas Corpus was placed in the prison mailing system on _____ (month, date, year).

Executed (signed) on   6/17/11   (date).

_____

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.